**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**August 29, 2012**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

GILBERT J. TURRIETTA,

        Defendant-Appellant.

No. 11-2033

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:10-CR-00242-JEC-1)**

David N. Williams, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, with him on the brief), Office of the United States Attorney, Albuquerque, New Mexico, for Plaintiff – Appellee.

Charles E. Knoblauch, Albuquerque, New Mexico for Defendant – Appellant.

Before **KELLY**, **O'BRIEN,** and **GORSUCH**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

## Introduction

A federal jury convicted Gilbert Turrietta of assaulting a law enforcement officer.

The jury reached its verdict despite having never been sworn. The problem would have

gone unnoticed were it not for a belated objection from Turrietta's attorney, Charles

Knoblauch. He knew from the outset of the trial that the jury had not been sworn, yet

strategically reserved any objection until a guilty verdict was returned and the jury had

dispersed.[1]

A verdict delivered by an unsworn jury may present an issue of constitutional

dimension, as Turrietta contends. But a compelling threshold issue prevents us from

resolving that issue. By lying behind the log, Knoblauch failed to preserve the issue he

wants us to decide. Quietly harboring an objection until it cannot be addressed

effectively is the functional equivalent of making no objection—at the very least, a

forfeiture.[2] Accordingly, our review is quite limited. Under the plain error doctrine, we

---

[1] To his everlasting credit, Knoblauch has admitted his knowledge and strategy.

[2] "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' *United States v. Olano,* 507 U.S. 725, 733 (1993) (citation marks omitted). Perhaps the failure to timely alert the court to the lack of a sworn jury could be treated as waiver, as the concurring opinion suggests. Generally speaking, remaining silent for strategic reasons is more consistent with waiver than forfeiture. *United States v. McGee,* 612 F.3d 627, 631 (7th Cir. 2010); *see also United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007). But, in spite of Judge Kelly's strong arguments, we are reluctant to take such a bold step, in part because we are unsure whether the right to a sworn jury— assuming, of course, there is such a right—is one only a properly advised defendant can waive.

In *United States v. Oakes*, we outlined waiver parameters:

[S]ome rights can be waived only if the defendant personally consents. *See Taylor v. Illinois*, 484 U.S. 400, 417–18 (1988). . . . "A defendant ... has the ultimate authority to determine whether to plead guilty, waive a jury, testify

cannot correct a forfeited error unless failing to do so would cement a clearly unjust result. We will not disturb the district court's refusal to declare the jury's verdict a nullity.

## Background

A team of U.S. Marshals needed to execute a warrant for Turrietta's arrest. Acting on a tip, they converged on his brother's residence in south Albuquerque. Moments after arriving, they found their fugitive, Turrietta, holed up in a backyard tool shed. Crouched

in his or her own behalf, or take an appeal." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). . . ."These four decisions naturally reside with the defendant because they implicate the two most basic tenets of our legal system—the opportunity to have a day in court and the opportunity to have a jury of peers." *United States v. Washington*, 198 F.3d 721, 724 (8th Cir.1999) (internal citations and quotations omitted).

The Supreme Court has not identified any additional decisions as the exclusive right of the defendant. Although it has not explicitly stated that it will go no further, we need not determine the precise outer boundaries . . . .

*United States v. Oakes*, 680 F.3d 1243, 1248 (10th Cir 2012)

Like *Oakes*, this is not a case where it is necessary to explore boundaries. Waiver of trial by jury is subject to procedural limitations; a defendant must not only participate personally in the waiver, but must do so in writing, with the consent of the government and the approval of the court. *See* Fed. R. Crim. P. 23(a). This is not to equate the right to trial by jury with the right to trial by sworn jury, but only to suggest that if the latter is, in fact, a right, its waiver may be subject to the same limitations as the former. *See Gonzales v. United States*, 553 U.S. 242, 250 (2008) ("[S]ome basic trial choices are so important that an attorney must seek the client's consent in order to waive the right."). The record is silent as to whether Turrietta consented to or was even consulted about the tactical method employed.

In any event, the government failed to raise waiver in its appeal briefs. Waiver can be waived. *See United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006). For that reason alone, we need not venture into the bog.

- 3 -

behind a bookshelf, he showed no signs of budging, so officers tried flushing him out with pepper spray. When the spray proved ineffective, Deputy U.S. Marshall Vincent Gambone and a second officer entered the shed to remove him by force. Turrietta resisted, grabbing Gambone by the shirt and pulling him into the shed. A struggle ensued during which Turrietta bit Gambone's forearm.

Turrietta was tried to a jury on one count of assaulting a federal officer. *See* 18 U.S.C. §§ 111(a)(1) & (b). Two juries (unrelated cases) were picked from the same venire, one after the other. Prior to voir dire in Turietta's case, the courtroom clerk administered an oath to the venire. All members of the venire swore to "truthfully answer all questions that shall be asked of you touching on your qualifications as jurors." (Appellee's Br. at 8.) Turrietta's jurors were seated in the jury box and then told to report back in two days.[3] When the transcript picks up two days later, the jury is seated and the judge is introducing the attorneys and reading preliminary instructions. The transcript contains no indication that the jury was sworn.[4]

The trial lasted seven hours over a period of two days. Deputy Gambone recounted the investigation and the events leading up to his confrontation with Turrietta, right down to the offending bite. Several officers present during the arrest corroborated

---

[3] Turrietta's trial was postponed so the other case could proceed to trial immediately after both juries were selected.

[4] The courtroom clerk's minutes, contained in the docket sheets, reflect that the venire was sworn for voir dire and the jury in the other case was sworn to try that case. No mention is made of Turrietta's jury having been sworn.

Gambone's testimony. One testifying officer saw Turrietta bite Gambone; another, whose view was obstructed, said she witnessed the two men struggling before hearing Gambone cry out in pain. The jury saw a photograph of the bite wound and heard testimony from the nurse practitioner who treated it.

Against this rather compelling evidence, the defense presented only the testimony of David Turietta, the defendant's brother and the owner of the residence where the arrest took place. Although David was present during the arrest and could hear his brother struggling with the officers, he could not see inside the shed and did not say whether his brother bit Gambone. To the extent his testimony conflicted with that of the officers, it was over matters collateral to the assault charges—the color of David's shirt, for instance, or his precise location in the house when the officers arrived. Gilbert Turrietta did not testify.

After less than two hours of deliberation, the jury returned a guilty verdict. It was polled at the request of the defense; each juror confirmed the verdict announced by the presiding juror. The trial judge accepted the verdict, thanked the jurors for their service, and extended an invitation for them to tour his chambers. The court was ready to adjourn when Knoblauch cut in: "Your honor?" he asked, "I have a couple of small matters I'd like the court to hear." The court asked Knoblauch whether he wanted the jury in or out. "The jury can be out," he replied. (Tr. at 366.)

Once the jury was released, Knoblauch promptly moved to set aside the verdict. As it turned out, the "small matter" he wanted to discuss with the court wasn't small at

all.  "My recollection might be false or incorrect in some manner," he said, "but I don't recall the jury ever being sworn in.  When we selected the juries, the other jury was sworn in, but I don't recall this particular jury being sworn in."  (Tr. at 366-67.)  The judge was not persuaded:  "I think the jury was," he said.  "I don't remember, either, but I always do it.  They know they're under oath anyway."[5]  (Tr. at 367.)  Knoblauch later filed an affidavit swearing that at no point was an oath administered to the jury.  It was accompanied by a motion claiming the verdict was a nullity.  For the purposes of this appeal, the government concedes the jury was not sworn to try this case.

## Discussion

Turrietta, still represented by Knoblauch, now contends the court's failure to administer the oath deprived him of his Sixth Amendment right to trial by jury.  He maintains it was error to allow the verdict to stand once the oversight had been brought to the judge's attention.[6]  At oral argument Knoblauch candidly admitted he was aware of

---

[5]  The judge mentioned the oath three times while instructing the jury:  "[I]n reaching your decision as to the facts, it is your sworn duty to follow all the rules of law as I explain them to you."  (Tr. at 321.); "It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy.  That was the promise you made and the oath you took."  (Tr. at 322.); "Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in these instructions."  (Tr. at 359.);  The prosecution also made a passing reference to the oath, admonishing the jury that "that's not the oath . . . you took.  The oath you took was:  Apply the law the judge just read to you . . ."  (Tr. at 352.)

[6]  The problem may have been called to the attention of the judge, but no pertinent legal analysis was ever presented.

- 6 -

the problem and could have objected prior to trial; he claimed he owed a duty to his client to exploit the opportunity fortuitously presented. Rather than object when the error could have been corrected, he decided to wait and see if the outcome was favorable.

Federal courts have limited authority to correct errors forfeited at trial because they were not timely raised. Fed. R. Crim. P. 52; *see Olano*, 507 U.S. at 731. ("'No procedural principle is more familiar to this Court than that a constitutional right,' or right of any sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'") (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). This limitation promotes the timely raising of objections, so claimed errors can be resolved by the district court before they affect the outcome of the trial. *See Puckett v. United States*, 556 U.S. 129, 134 (2009). It also prevents a litigant from "'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.*

Knoblauch's considered and measured silence demonstrates the need for a contemporaneous-objection rule. He did not invite error, but he compounded it. The law takes a dim view of such tactics.[7] *See Puckett*, 556 U.S. at 134. Overlooking the forfeiture would be contrary to the contemporaneous-objection rule. Accordingly, we

---

[7] We do not know whether Turrietta was consulted about the strategy, but it is no defense to say it was done in the client's interest. Seldom will violating a procedural rule work in favor of the client; this case is no exception.

review only for plain error.[8]

Plain error review[9] involves four steps.  Turrietta must demonstrate the district court (1) committed error, (2) the error was plain, and (3) the plain error affected his substantial rights.  If he can make these showings, we may exercise discretion to correct the error if it (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011).

Turrietta cannot satisfy the plain error test.  Even assuming the failure to administer the oath was constitutional error, the error was neither so clear that the district judge can be faulted for refusing to act when it was belatedly called to his attention, nor so grave that failure to correct it on appeal would threaten the integrity of judicial proceedings or result in a miscarriage of justice.  We need not decide whether the right to

---

[8] This case is similar to *Olano*.  Plain error analysis is the correct analytical approach here, as it was there. "[T]he operation of Rule 52(b) does not permit a party to withhold an objection to the presence of alternate jurors during jury deliberations and then to demand automatic reversal." *Olano*, 507 U.S. 743 (Kennedy, J., concurring).

[9] Turrietta's claim of "structural" error has little bearing on the application of the plain error test.  Rule 52(b) does not permit exceptions based on the gravity of the asserted error.  *See Puckett*, 556 U.S. at 135-36; *Johnson v. United States*, 520 U.S. 461, 466 (1997) ("the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure.").  Whether an error can be properly characterized as "structural" has nothing to do with plain error review under Rule 52(b), and everything to do with *harmless* error review under Rule 52(a).  *See Puckett*, 556 U.S. at 139 ("Whether an error can be found harmless is simply a different question from whether it can be subjected to plain-error review.").  Stated differently, if a forfeited error is structural, it cannot be harmless because we will presume prejudice. But that does not foreclose application of plain error review.  At most, it may impact the third step of plain error analysis.  See discussion in part C, *infra.*

trial by jury necessarily encompasses a right to a sworn jury, but we must discuss the issue because it bears directly on step two of our plain error analysis and at least tangentially on steps three and four.

A.  Whether the district court committed error

The right to trial by jury in criminal cases is secured by two constitutional provisions.  Article III, sec. 2 provides, "The Trial of Crimes, except in Cases of Impeachment, shall be by Jury. . ."  U.S. CONST. art III, § 2, cl. 3.  The Sixth Amendment adds flesh to the guarantee, providing, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . ."  U.S. CONST. amend. VI.

Turrietta contends a sworn jury is a critical ingredient of the right to trial by jury. In his view, when the Constitution refers to "jury," it refers to one so constituted at common law, where the oath was an accepted feature of a duly impaneled jury.  His unstated premise is that the Constitution preserved the common law requirements of the jury, with the institution's history setting the boundaries of its constitutional scope.  He relies on the Supreme Court's decision in *Patton v. United States*, 281 U.S. 276, 288 (1930), where it was held that "[trial by jury] means a trial by jury as understood and applied at common law, and includes all the essential elements as they were recognized in this country and England when the Constitution was adopted . . . ."

But *Patton* has been obsolete since 1970, the year the Supreme Court revisited its approach to the Sixth Amendment and changed course.  *See Williams v. Florida*, 399

- 9 -

U.S. 78, 93-94 (1970) (holding a conviction by a six-member jury did not violate the Sixth Amendment). "[T]he relevant constitutional history," the Court explained in *Williams*, "casts considerable doubt on the easy assumption in our past decisions that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution."[10] *Id*. at 92. After canvassing founding-era sources, the Court abandoned the precept, foundational to *Patton* and earlier Sixth Amendment decisions, that the Constitution entrenched the prevailing understanding of trial by jury at common law. *Id*. at 92-93. "[T]here is absolutely no indication in the 'intent of the Framers' of an explicit decision to equate the constitutional and common-law characteristics of the jury."

---

[10] Central to the Court's conclusion was the history of the Sixth Amendment, beginning with an early version introduced in the House of Representatives by James Madison, which provided for trial "by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites. . ." *Williams*, 399 U.S. at 94 (citing 1 Annals of Cong. 435 (1789). The proposed amendment stalled in the Senate, where lawmakers opposed the vicinage (neighborhood) requirement and the "accepted requisites" language. The amendment ultimately adopted by the conference committee (and later by Congress and the several states) made no reference to "accepted requisites," and reflected a compromise over the vicinage requirement, providing for trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." *Id*. at 96. The *Williams* Court drew two salient inferences from the amendment's history. First, the Sixth Amendment was drafted on the assumption that the jury clause in Article III, sec. 2 had *not* incorporated the common law features of the jury. How else to explain the perceived need to add the vicinage requirement, a requisite of trial by jury at common law? *See id.* at 96-97. Second, the deletion of the "accustomed requisites" language had substantive effect. *Id*. As the Court would later explain, "Surely one fact that is absolutely clear from this history is that, after a proposal had been made to specify precisely which of the common-law requisites of the jury were to be preserved by the Constitution, the Framers explicitly rejected the proposal and instead left such specification to the future." *Apodaca v. Oregon*, 406 U.S. 404, 410 (1972).

*Id.* at 99.  Freed from the dictates of historical practice, the Court revised the inquiry to focus on the contemporary role of the jury, with the aim of ascertaining "the function that the particular feature performs and its relation to the purposes of the jury trial."  *Id.* at 99-100.

Viewed in this light, Turrietta's emphasis on the common-law history of the oath is misplaced.  No longer can we assume that features once implicit in the very concept of the jury have constitutional stature.  The appropriate question, rather, is whether the oath is essential to the purpose served by the jury.  That purpose "is to prevent oppression by the government," with the central function of the jury lying "in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence."  *Id.* at 100.

Although we do not resolve the issue here, we can readily perceive a difference, in terms of this central function, between a sworn and an unsworn jury.  Sworn jurors stand before a judge with uplifted hands and recite an oath designed to impress a duty on their conscience.  They promise to carry out their charge—to render a verdict in accordance with the evidence—conscientiously and impartially, based on the court's instructions on the law.  Whether swearing an oath makes jurors more reliable factfinders is a question we are unequipped to answer, but the principle behind the exercise is sound: A juror impressed with the seriousness of his charge is more likely to be attentive at trial and, in turn, more likely to carry out his duty faithfully, with due respect for the ideals

underlying the criminal process.  *See United States v. Martin*, 740 F.2d 1352, 1358 (6th

Cir. 1984) ("Swearing the jury . . . serves to emphasize the importance and seriousness of

the juror's task. . . .").  In this sense, it is fair to presume the oath furthers the fair

resolution of factual issues.

Warranted or not, the presumption that jurors will honor the oath has been long at

work in the federal courts.  *See, e.g.*, *United States v. Marchant*, 25 U.S. 480, 482 (1827)

("The law presumes, that every juror sworn in the case is indifferent and above legal

exception. . . ."); *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) ("We

presume jurors will remain true to their oath and conscientiously follow the trial court's

instructions.").[11]  Trust in the efficacy of the oath is necessary in a system built on the

virtues of a powerful and independent jury.  It lends resiliency to the criminal proceeding,

allowing the jury to try a case without being dismissed at the very whiff of a corrupting

influence, or hauled in for questioning when deliberations last too long, or not long

enough.  *See United States v. Delgado*, 668 F.3d 219, 228 (5th Cir. 2012) (upholding trial

court's denial of motion to contact juror on the ground that "jurors are presumed to have

faithfully performed their official duties."); *see also United States v. Boone*, 458 F.3d

_____

[11] *See also United States v. Padilla*, 639 F.3d 892, 898 (9th Cir.), *cert denied,* 132 S. Ct. 254 (2011) ("When a jury is sworn, it is entrusted with the obligation to apply the law, and we in turn presume that juries follow instructions given to them throughout the course of the trial."); *United States v. Beckman*, 222 F.3d 512, 519 (8th Cir. 2000) ("[T]his court should and does assume that a jury, sworn by oath to follow the law, did, in fact, do so."); *United States v. Dougherty*, 473 F.2d 1113, 1135 (D.C. Cir. 1972) ("The way the jury operates may be radically altered if there is alteration in the way it is told to operate.").

321, 328-29 (3d Cir. 2006) (stressing importance of deliberative secrecy when addressing charges of juror misconduct); *United States v. Eldred*, 588 F.2d 746, 752 (9th Cir. 1978); Mary Strauss, *Sequestration*, 24 AM. J. CRIM. L. 63, 80 (1996) ("[J]urors need not be secluded from all information in order to remain faithful to the impartiality requirement.").

The gravity of jury duty is first impressed upon the jurors prior to voir dire examination, when the venire swears to answer questions truthfully. These affirmations provide certain assurances to the parties: the case will be tried impartially, free from prejudice and predisposition; jurors will honor the presumption of innocence; and jurors will hold the government to its burden of proof. *See Beckman*, 222 F.3d at 519. Jurors' affirmations also assure the court that they will answer questions honestly and abide by its instructions. *Id*. These assurances reduce the need to examine each potential juror to determine his or her take on the various rights, burdens, and presumptions likely to arise at trial. *Id*.

Trust in the oath continues during jury selection, where a pledge of impartiality can counteract beliefs or experiences otherwise suggestive of bias. *See United States v. Bedonie*, 913 F.2d 782, 796-97 (10th Cir. 1990); *United States v. Khoury*, 901 F.2d 948, 955-56 (11th Cir. 1990). When a juror is challenged for cause, the question is whether he can, as he swore to do, "set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A death sentence is unconstitutional if imposed by

a jury from which potential jurors were excluded, based solely on their opposition to that penalty, unless affirmative evidence is presented suggesting their opposition would prevent them from carrying out their sworn duty. *Adams v. Texas*, 448 U.S. 38, 43 (1980); *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1969); *Trujillo v. Sullivan*, 815 F.2d 597, 605-06 (10th Cir. 1987).

And while we are no longer constrained by common-law principles in determining the extent of the right to trial by jury, an examination of the oath and its constitutional role would be incomplete if it failed to account for historical understanding and practice. The oath has been integral to the factfinding process since ancient times, and there is no disputing Turrietta's assertion that it was an accepted feature of a properly constituted jury at common law. *See United States v. Cox*, 36 U.S. 162, 163 (1837); *Brewer v. Jacobs*, 22 F. 217, 242 (C.C. Tenn. 1884); Noah Webster, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 168 (1806) (defining "jury" as "persons sworn to deliver truth on such evidence as shall be given before them."); Richard Burn, LAW DICTIONARY 46 (1792) (describing swearing procedure). More importantly, unlike the rule fixing a jury at twelve, which has been variously described as an "historical accident" and "wholly without significance except to the mystics," *Williams*, 399 U.S. at 102 (quotation marks omitted); or the requirement that the jury reach a unanimous verdict, the origins of which "are shrouded in obscurity," *Apodaca*, 406 U.S. at 407 n.2; the swearing requirement has always born a clear and logical relationship to the jury's role as factfinder. *See* Jonathan Belcher, *Religion-Plus Speech: The Constitutionality of Juror*

- 14 -

*Oaths and Affirmations Under the First Amendment*, 34 Wm. & Mary L. Rev. 287, 292-93 (Fall 1992).

Given that the oath predated the development of the modern jury system, it is difficult to imagine the jury gaining legitimacy as a factfinding body without a swearing requirement.[12]  *See* 1 McCormick On Evid. § 114 (6 ed).  Trial by oath—an alternative to trial by combat or trial by ordeal—was an antecedent of trial by jury.  In its most basic iteration, the accused could obtain an acquittal by inviting God to punish him in the event he testified falsely.  Ryan Patrick Alford, *How Do You Trim the Seamless Web: The Unintended Consequences of Pedagogical Alterations*, 77 U. Cin. L. Rev. 1273, 1297 (2009).  In more elaborate proceedings, parties produced oath helpers, or compurgators, to vouch for the credibility of their positions.  *Id.*; 1 Attorney-Client Privilege in the U.S. § 1: 2.  The compurgator was a precursor to the modern juror, though it would be centuries before the jury transformed from a witnessing body to a factfinding body. Laurie C. Kadoch, *So Help Me God: Reflections on Language, Thought, and the Rules of Evidence Remembered*, 9 Rutgers J. L. & Religion 2, 14 (2007).

But even as a factfinding body, the legitimacy of the jury still hinged on the

---

[12]  Along with the oath's time-honored role in the factfinding process, there is the decidedly American tradition of treating the jury oath as the point during trial when a defendant is deemed to have been put in jeopardy.  This is in keeping with the principle, rooted in due process, that a defendant has the right to have the jury first impaneled to try him reach a verdict: "Throughout [Anglo-American] history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict."  *Crist v. Bretz*, 437 U.S. 28, 36 (1978).

reliability of the oath, and the reliability of the oath, in turn, on the individual juror's reputation in the community. The jury consisted of locals whose oaths were most trusted, whether by virtue of their credibility, their expertise, or their personal knowledge of the facts. *Id*.; Jane E. Findlater, *Retrial After a Hung Jury: The Double Jeopardy Problem*, 129 U. Pa. L. Rev. 701, 705-06 (1981). So even as the oath lost favor as a mode of proof, it remained integral to the jury's truth-seeking function and its legitimacy as a "symbol of authoritative knowledge." Kadoch, *supra* at 12 ("At the time and place, the basis of the trust placed in the jury's voice had rational validity because jurors were selected from those most likely to know and for those whose oaths were believed to be beyond reproach."). It is a testament to the trust the English placed in the oath that they would commonly exclude atheists from serving on juries for fear they would have no motivation to honor their oaths, a practice carried over in the American system, where it was widely used until the end of the 19th Century. *See* Belcher, at 292-93; *see also State v. Washington*, 22 So. 841, 842 (La. 1897); *Priest v. Nebraska*, 6 N.W. 468, 469-70 (Neb. 1880).[13]

---

[13] Religious objectors and nonbelievers eventually persuaded courts and legislatures to put an end to this practice. Courts began allowing atheists to testify as witnesses and serve on juries in the early 1900s, and by the 1940s, most states had enacted statutes granting all persons the right to testify. Jonathan Belcher, *Religion-Plus Speech: The Constitutionality of Juror Oaths and Affirmations Under the First Amendment*, 34 Wm. & Mary L. Rev. 287, 293-94 (Fall 1992). "The history of oaths and affirmations indicates that the affirmation was devised to rectify many of the complaints of religious objectors." *Id*. at 294. Congress incorporated the affirmation in the modern rules of evidence with the same principles in mind. Today, witnesses must declare that

In short, the oath is bound up with some of the great principles giving rise to the very concept of a jury trial. With its appeal to divine judgment and its enduring impression on the conscience of the juror, the oath has "moved seamlessly" from medieval modes of decisionmaking into the modern courtroom. *See* Kadoch, *supra* at 7. Its history, together with certain common sense assumptions about the way it works in practice, reveals a strong relationship to the jury's reliability as a fact finder. Whether the relationship is strong enough to afford the oath constitutional stature is a question we leave unanswered, for even assuming Turrietta could demonstrate a constitutional violation, he cannot satisfy the second and fourth prongs of the plain error test.

B.  Whether the error was plain

It is not enough, under Rule 52, that there is "error"; there must be "plain" error— that is, a "clear" or "obvious" error that should have been readily apparent to the district judge, such that failure to object would not deprive the court of a reasonable opportunity to correct it. *Olano*, 507 U.S. at 734. Since a district court cannot be faulted for failing to act on its own motion where the law is unsettled, a matter of first impression will generally preclude a finding of plain error. *See United States v. Fishman*, 645 F.3d 1175, 1193 (10th Cir. 2011), *cert denied,* 132 S. Ct. 1046 (2012); *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003). The one exception is an error which infringes

they "will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so." Fed. R. Evid. 603.

upon a "well-established constitutional principle."  *See United States v. Laureys*, 653

F.3d 27, 33 (D.C. Cir. 2011), *cert denied*, 132 S. Ct. 1053 (2012).

While we respect Turrietta's constitutional claim, his argument sounds in history

rather than law.  We cannot say it is obvious, under the formulation set forth in *Williams*,

that failure to administer the oath was constitutional error.  First, the issue is one of first

impression in the federal courts, and we are aware of no binding authority, whether in the

form of a constitutional provision, statute, rule, or judicial decision, addressing whether

the Sixth Amendment right to trial by jury necessarily requires the jury be sworn.

Moreover, the absence of a statute or rule is especially telling, not only because swearing

requirements regularly appear in less weighty contexts, *see, e.g.*, 5 U.S.C. § 303

(Executive Department investigations); 8 U.S.C. § 1357(b) (immigration enforcement);

11 U.S.C. § 727(a)(4)(A) (discharge in bankruptcy); 12 U.S.C. § 73 (national bank

directors), but also because it would be farfetched to infer from the volumes of statutes

and rules relating to criminal procedure generally and jury trials specifically—laws

codifying principles as fundamental as the right to a jury in criminal cases, *see* Fed. R.

Crim. P. 23(a), and as marginal as the rule allowing for 11-person verdicts, *see* Fed. R.

Crim. P. 23(b)(3)—that Congress simply *forgot* about the sworn jury.

Turrietta draws a different conclusion from the absence of a federal law addressing

the swearing requirement.  In keeping with his position that the right to a sworn jury is so

universally accepted as to be taken for granted, he contends the requirement was left out

on the assumption it was preserved by the Constitution.  Its absence, in other words, is

proof of its significance. Since this assertion can be neither disproven nor verified, the best that can be said for it is that it ends in a wash. Congressional silence is open to the explanation that the swearing requirement was thought to be incorporated by the Constitution. But it is equally plausible that the requirement was never meant to have the force of law. Turrietta's theory would have more appeal if its converse were true—that is, if federal criminal procedures were designed to be exclusive of rules of constitutional law, so that the existence of one meant the absence of the other. But there are numberless federal rules with constitutional analogs, many of them orders of magnitude more established than the one asserted here. *See*, *e.g.*, Rule 4 (warrant requirement); Rule 6 (grand jury indictment); Rule 11 (knowing and voluntary plea); Rule 18 (venue of trial), Rule 23(a) (trial by jury). Turrietta would have us believe, implausibly, that above all the constitutional guarantees embodied in the rules of criminal procedure, it was the right to a sworn jury that was too obvious to bear repeating.

Judicial decisions provide little in the way of clarity. At least one leading treatise has concluded the question whether the oath is required in federal courts is up in the air. *See* Romualdo P. Eclavea, et al., 47 AM. JUR. 2D JURY § 192 (2011); *see also United States v. Pinero*, 948 F.2d 698, 700 (11th Cir. 1991) ("[I]t is not clear from the case law whether juries in the federal system are required to be sworn in."). No federal court in the history of American jurisprudence has held the constitutional guarantee of trial by jury to necessarily include trial by sworn jury. While courts routinely recognize the jury oath as standard *practice* in federal trials, only a handful have suggested the failure to

duly swear the jury would amount to error, *see, e.g.*, *United States v. Little Dog*, 398 F.3d 1032, 1036-37 (8th Cir. 2005) (failure to swear in jury until after opening statements was harmless error); *United States v. Martin*, 740 F.2d 1352, 1358 (6th Cir. 1984) (disapproving of procedure where prospective jurors are sworn en masse rather than in individual panels); *Cooper v. Campbell*, 597 F.2d 628, 629 (8th Cir. 1979) (untimely oath was harmless error); *United States v. Hopkins*, 458 F.2d 1353, 1354 (5th Cir. 1972) (same), and even those courts cannot agree on the source of the error, with some pointing to the Sixth Amendment, *Cooper*, 597 F.2d at 529; others to the Fifth Amendment's Double Jeopardy Clause, *Little Dog*, 398 F.3d at 1036-37; and still others to the "dignity and effectiveness which should attend federal court trials," *Martin*, 740 F.2d at 1358.

We recognize that error not necessarily contrary to settled law can be "plain" if it relates to a "well-established" constitutional principle, *Laureys*, 653 F.3d at 33; before *Williams*, a strong case could be made, based on the history of the swearing requirement and its prevalence at common law, that the Sixth Amendment preserved the right to a sworn jury. But *Williams* upended the conventional wisdom on the Sixth Amendment, transforming what was once a clear-cut historical inquiry—was the feature a requisite of the jury trial at common law?—into a more textured one—does the feature further the central purpose of the jury trial? By divorcing the history of the jury trial from its constitutional scope, *Williams* introduced an element of uncertainty into the analysis, with the result that features once considered implicit in the concept of trial by jury have since been stripped of constitutional stature. *Compare Patton*, 281 U.S. at 288 (holding

- 20 -

that trial by jury means a jury consisting of twelve and rendering a unanimous verdict "is not open to question"), *with Apodaca*, 406 U.S. at 412-13 (The Sixth Amendment guarantee of a jury trial, as applied to the states by the Fourteenth Amendment, does not require unanimous jury verdict);[14] *Williams*, 399 U.S. at 100 (Sixth Amendment does not require the jury to be fixed at twelve persons).  The oath may ultimately avoid this fate, but even with extensive briefing and the luxury of time for reflection we cannot say its constitutional status is either clear or obvious.

"At a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."  *Olano*, 507 U.S at 734.  The superficial clarity of the claimed constitutional right to a sworn jury fades under close scrutiny, as we have demonstrated.  Turrietta may be correct, but not clearly so. That lack of clarity might well end this debate.  However, reasonable minds can differ.  For that reason we continue our plain error analysis.

C.  Whether the error affected Turrietta's substantial rights

A plain error is not redressable on appeal unless the defendant can show it affected his "substantial rights."  This is simply another way of saying the error must have been

---

[14]  The limited holding in in *Apodaca* was the result of a three-way division among the justices.  A four-justice plurality concluded the Sixth Amendment does not require unanimous jury verdicts in either federal or state trials, a separate four-justice plurality concluded the Sixth Amendment requires unanimous verdicts in state and federal trials, and Justice Powell concluded the Sixth Amendment requires unanimity in federal but not state trials.  *Apodaca*, 406 U.S. at 406, 414-15.

prejudicial. *Olano*, 507 U.S. at 734. Arguing the error in this case falls into a category of "structural" errors that eliminate an inquiry into prejudice, Turrietta would have us bypass the third prong. The Supreme Court has reserved the question whether structural error necessarily affects substantial rights under the plain error test, thereby obviating the need to consider the effect on the outcome of the trial. *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010); *United States v. Cotton*, 535 U.S. 625, 632-33 (2002). We, on the other hand, have assumed a showing of structural error necessarily satisfies the substantial-rights prong. *United States v. Wiles*, 102 F.3d 1043, 1057 (10th Cir. 1996) (abrogated on other grounds); *but see United States v. Gonzalez-Edeza*, 359 F.3d 1246, 1251 n.3 (10th Cir. 2004).

Whether failure to swear in the jury should be considered structural error is a more difficult question. On the one hand, the consequences of failing to swear in the jury are difficult to ascertain, and errors that defy measurement are strong candidates for the "structural" label. *See Waller v. Georgia*, 467 U.S. 39, 50 n.9 (1984); *United States v. Curbelo*, 343 F.3d 273, 281 (4th Cir. 2003) (depriving defendant of twelve-person jury was structural error). An unsworn jury would seem to fit the mold of a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," which is how the Supreme Court described structural error in *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).

On the other hand, not all unquantifiable errors are structural; the Supreme Court has stressed that errors which do not contribute to the verdict should not be reversed

- 22 -

unless their effect is fundamentally unfair, with fundamental fairness being a question of whether the defendant has been provided an impartial adjudicator and an attorney to help him defend the charges. *See Rose v. Clark*, 478 U.S. 570, 579 (1986) ("Where a reviewing court can find that the record at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed."). Turrietta does not dispute that those minimum requirements were met here.

We can postpone resolution of this question. Even if we were to credit Turrietta arguments about structural error, we have already determined the error was not "plain" under current law such that we may overlook the absence of an objection. And, as it will soon become clear, even if Turrietta could satisfy the first three steps, we would not exercise discretion in his favor because the error did not "seriously affect the fairness, integrity, or public reputation of the judicial proceedings," as required under the fourth prong of the plain error test. *Gonzalez-Edeza*, 359 F.3d at 1251.

D. <u>Whether the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.</u>

The fourth prong of the plain error test is discretionary. If the defendant can show an error is plain and affects substantial rights, a court must exercise considered judgment in deciding whether the error must be corrected. A court should do so where it "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. Although a showing (or presumption) of prejudice is necessary to meet this prong, it is not sufficient because not every prejudicial error threatens the fairness and integrity of

- 23 -

the proceedings. *United States v. Rausch*, 638 F.3d 1296, 1301 n.2 (10th Cir. 2011). Rather, the fourth prong is an independent inquiry, more appropriately compared with a miscarriage of justice standard under which a claimed error should not be corrected, unless allowing it to stand would be "particularly egregious." *United States v. Garza*, 566 F.3d 1194, 1201 (10th Cir. 2009). [15]

Turrietta starts from behind on this step because he does not even *assert* in his appeal brief that, had the jury been duly sworn, the outcome of trial would have been different. Harm flowing from jury error often defies measurement and we recognize that the integrity of the system may suffer, even if only in theory, each time a defendant is convicted by an unsworn jury; but it is not enough at this stage to simply identify an error that is categorically serious. The Supreme Court has rejected a "per se approach" to the fourth prong, stressing that if the inquiry is to be of any use, it must be applied "on a case-specific and fact-intensive basis," and must account for "countervailing factors" that may arise in a particular case. *Puckett*, 556 U.S. at 142-43.

Surely there are cases where the benefit of the sworn jury will be heightened by the complexity of the law or the indeterminacy of the evidence. But if ever there were an occasion where our system could countenance conviction by an unsworn jury, where the

---

[15] While the Court has reserved judgment on whether a structural error can automatically satisfy *Olano's* third, substantial-rights, prong, *see Cotton*, 535 U.S. at 632-33, it has rejected the proposition that an error can be so grave as to categorically satisfy prong four, which, the Court has stressed, "is meant to be applied on a case-specific and fact-intensive basis." *Puckett*, 556 U.S. at 142.

"countervailing factors" eclipse any potential unfairness flowing from the trial error, this is it. [16] The Turrietta trial lasted seven hours and involved a single count of assault. The evidence supporting the charge was as uncomplicated as it was damning, and the defense rested without putting a dent in the testimony of the only two eye witnesses. Seldom does a jury enter deliberations with issues so sharply defined and evidence so clearly stacked against the defendant. We are faced not with "the intolerable injustice of a man wrongly accused," *see United States v. Hasan*, 526 F.3d 653, 666 (10th Cir. 2008), but rather a record that leaves no doubt the defendant was guilty of the charged offense. [17]

Quite apart from the evidence of Turrietta's guilt, any threat to the integrity of the proceedings was mitigated by an otherwise fair and procedurally rigorous trial. The jury was fairly selected and clearly instructed, and the trial was open to the public and administered by an unbiased judge. Turrietta availed himself of his right to counsel and received an unfettered opportunity to put on evidence and make arguments in defense of his innocence.

Moreover, the record supports the government's contention that the jury understood the thrust of what the oath was designed to impart. The jurors were all sworn

---

[16] And the converse is also true. If the government sought to retry a defendant acquitted by an unsworn jury, it would be hard-put to argue that jeopardy had not attached, particularly if it knowingly failed to timely notify the court of the problem.

[17] The strength of the government's case may not, alone, preclude relief at step four, but we describe other compelling preclusive factors. At the forefront is Turrietta's strategic silence. The judicial system succeeded in avoiding manipulation; it did not fail to deliver justice in this case. There was no systemic failure.

to tell the truth during voir dire and were on several occasions reminded by the court of their "sworn duty" to try the case truly and in accordance with the law.  The admonition was reinforced over the course of the trial by a steady drumbeat of instructions stressing the importance of rendering a verdict in light of the burden of proof and based solely on the evidence presented.  Between the instructions, the oath at voir dire, and the repeated references to the oath at trial, the jurors had plenty to remind them of the importance of their task.  If, owing to some overpowering prejudice or belief in jury nullification,  a juror was still unwilling to decide the case based on the law and evidence, it is doubtful the oath would have made a difference.

If anything would imperil the integrity of the judicial proceedings, it would be a decision rewarding Knoblauch for holding his objection in his back pocket hoping it might ultimately work in his client's favor. *See Johnson v. United States*, 520 U.S. 461, 470 (1997) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.") (quotation marks omitted).  It is one thing to overlook an error; it is something else entirely to compound it.  If Knoblauch believed the failure to administer the oath would deprive his client of a fair trial, he should have said so—immediately.  His decision to ignore the error for strategic reasons suggests something about the seriousness with which he viewed the court's oversight and the earnestness with which he prosecuted this appeal.

The interests of justice are generally not served by allowing a party to object to an error after the trial has concluded and the party has lost.

AFFIRMED.

No. 11-2033, United States v. Turrietta

**KELLY**, Circuit Judge, concurring.

I concur in the result but would hold that Mr. Turrietta waived the error of an unsworn jury by failing to object before the jury was discharged. I appreciate the court's rich and careful discussion of this aspect of trial by jury, but for me the crucial fact is that the defense admitted that the court's error was fully appreciated but held any objection in reserve in order to attack a guilty verdict. Under these circumstances, the failure to make a contemporaneous objection was a matter of strategy, not neglect, and constituted consent to proceed with an unsworn jury. See Puckett v. United States, 556 U.S. 129, 1431 (2009) (noting that waiver involves an intentional relinquishment or abandonment of a right to seek relief from the error complained of). I would also not conduct plain-error review because Mr. Turietta does not seek plain error review on appeal. See United States v. Oldbear, 568 F.3d 814, 820 (10th Cir. 2009) (failure to brief plain error forfeits appellate review).

I doubt the mistake here falls into that narrow category of error deemed structural error. See Johnson v. United States, 520 U.S. 461, 468-69 (1997). The Court, in Baldwin v. Kansas, 129 U.S. 52, 56 (1889), considered a holding of the Kansas Supreme Court that if an oath was defectively given, the defendant should have told the court and could not sit silently by, hope for an acquittal, and then, after conviction, object. The Court said this ruling raised no federal question. In Patton v. United States, 281 U.S. 276, 312 (1930), the Court held that a defendant can waive the right to trial by twelve jurors. Eleven had served. If jury by twelve peers can be waived, it seems likely that one can

waive a jury by twelve *sworn* peers.

On appeal, Mr. Turrietta does not argue that his participation in this strategy was necessary, let alone lacking. See United States v. Oakes, 680 F.3d 1243, 1248 (10th Cir. 2012). I am persuaded by those state courts that hold that when an attorney notices the irregularity but says nothing, then waits for an unfavorable verdict to object, he waives his client's right and cannot be heard to complain. See, e.g., Sibley v. Dial, 723 S.E.2d 689, 691 (Ga. Ct. App. 2012); State v. Vogh, 41 P.3d 421, 426-27 (Or. Ct. App. 2002); State v. Arellano, 965 P.2d 293, 296 (N.M. 1998); Sides v. State, 693 N.E.2d 1310, 1312 (Ind. 1998). The reasoning generally is that if an attorney informs the court of the inadvertence, it can be readily corrected with a belated administration of the oath. But knowing silence treats an objection like an insurance policy against an adverse result and is akin to waiver. I would decline to notice the error. A party should not benefit from tactical muteness when speaking up would have ensured prompt correction. We would not be the first federal circuit to so hold in the general context of oaths. See United States v. Martin, 740 F.2d 1352, 1358 (6th Cir. 1984).

We have discretion under Rule 52(b) to correct plain error, the category of "forfeited-but-reversible error," United States v. Olano, 507 U.S. 725, 732 (1993), using a four-part inquiry. But "plain error" was never mentioned in Mr. Turrietta's brief, and of course he would have the burden of persuasion on such a claim. Id. at 734. His claim was that the "verdict rendered was a nullity." Aplt. Br. 7. To the extent that Mr. Turrietta is claiming structural error, we recently commented that "[a] defendant failing to object to

-2-

structural error in the district court likely would still need to establish that an error was plain and seriously affected the fairness, integrity, or public reputation of the judicial proceedings." See United States v. Kieffer, 681 F.3d 1143, 1158 (10th Cir. 2012).[1] Waiver results when a party, after deliberation, chooses a particular litigation position to press while foregoing others. United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183-84 (10th Cir. 2009).

My purpose is not to diminish the oath's significance but to honor it. All parties to a criminal proceeding are summoned to help secure the proper administration of justice. Reserving objections until correction is impossible is to be discouraged.

---

[1] The Court has never decided whether a structural error would automatically satisfy the third element of the plain error test; whether the error affects substantial rights. See Puckett v. United States, 556 U.S. 129, 140-41 (2009). In both Johnson v. United States, 520 U.S. 461, 468-69 (1997), and United States v. Cotton, 535 U.S 625, 632-33 (2002), defendants claimed that the error was structural, yet the Court still applied the plain error test, assuming that the error affected substantial rights, and then considered whether the error affected the "fairness, integrity or public reputation" of the proceeding. The Court did not decide whether the specific errors were structural, but implied they were not. In Kieffer, we noted the apparent tension between dispensing with an individualized assessment of whether a structural error affects substantial rights for harmless error under Fed. R. Crim. P. 52(a), but requiring it for plain error under 52(b). Id.