# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v CAIN

Docket No. 149259. Argued March 11, 2015 (Calendar No. 2). Decided July 23, 2015.

Brandon L. Cain was convicted in the Wayne Circuit Court of two counts of first-degree premeditated murder, MCL 750.316(1)(a); two counts of felony murder, MCL 750.316(1)(b); two counts of torture, MCL 750.85; two counts of unlawful imprisonment, MCL 750.349b; carrying a firearm during the commission of a felony, MCL 750.227b; and being a felon in possession of a firearm, MCL 750.224f. At the start of the trial, the court, Vonda R. Evans, J., stated to the jury, "I will now ask you to stand and swear to perform your duty to try the case justly and to reach a true verdict." The court clerk then proceeded to swear in the jury, but mistakenly read the oath given to prospective jurors before voir dire (that they would answer the questions concerning juror qualifications truthfully) rather than the juror's oath set forth in MCR 2.511(H)(1). There was no objection to the failure to administer the proper oath. Defendant raised the issue of failing to properly swear the jury for the first time on appeal, moving for peremptory reversal of his convictions. The Court of Appeals granted the motion in an unpublished order, entered May 2, 2014 (Docket No. 314342), concluding that the failure to properly swear the jury was a structural error requiring a new trial. The prosecution sought leave to appeal, which the Supreme Court granted. 497 Mich 861 (2014).

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices KELLY, ZAHRA, and BERNSTEIN, the Supreme Court *held*:

Because the jurors were conscious of the gravity of the task before them and the manner in which that task was to be carried out, the two primary purposes served by the juror's oath, the error of failing to properly swear the jury in this case did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

1. Because defendant did not object to the trial court's failure to properly swear the jury and therefore did not preserve the issue for appellate review, relief could be granted only if defendant (the person asserting that an error occurred) satisfied the four-pronged plain-error test set forth in *People v Carines*, 460 Mich 750 (1999), by showing (1) that an error occurred, (2) that the error was plain, that is, clear or obvious, and (3) that the error affected substantial rights, that is, that the outcome of the lower court proceedings was affected. If these elements are satisfied, the fourth *Carines* prong requires the appellate court to exercise its discretion in deciding whether to reverse, and (4) relief is warranted only when the appellate court determines

that the plain, forfeited error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

2. The parties agreed that the failure to properly swear the jury constituted a plain error that satisfied the first and second *Carines* prongs, but disagreed about the third and fourth prongs. Even assuming that defendant had established the third prong, however, the trial court's failure did not seriously affect the fairness, integrity, and public reputation of the judicial proceedings in this case and defendant did not even argue that he was actually innocent. The fourth *Carines* prong is meant to be applied on a case-specific and fact-intensive basis. The operative inquiry is whether the error of failing to properly swear the jury in the particular case seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

3. The oath found in MCR 2.511(H)(1) imposes three duties on jurors: (1) to justly decide the questions submitted to them, (2) to render a true verdict, and (3) to do those things only on the evidence introduced and in accordance with the instructions of the court. The oath represents a solemn promise on the part of each juror to do his or her duty according to the dictates of the law to see that justice is done. The oath is administered to ensure that the jurors pay attention to the evidence, observe the credibility and demeanor of the witnesses, and conduct themselves at all times as befits one holding an important position.

4. The error here did not undermine the broader pursuits and values that the oath seeks to advance, however. One of the primary purposes of the oath (imparting to the jury members their duties as jurors) was alternatively fulfilled in large part by the trial court's instructions prescribing the particulars of the jurors' duties. The court instructed the jurors (1) that it was their responsibility to decide the facts of the case solely on the basis of the evidence presented and the law as the court gave it to them, (2) that they should not consider any other information regarding the trial that was not presented in the courtroom, (3) that they should not discuss the case among themselves until deliberations began, and (4) that they should keep open minds about the case, setting aside any bias and prejudice. The court also explained the concepts of the presumption of innocence and reasonable doubt. The court's instructions encompassed in even greater detail duties equivalent to those prescribed in the oath.

5. Another virtue of the juror's oath is the powerful symbolism and sense of duty it imbues the oath-taker with and casts on the proceedings. That virtue was not lost in these proceedings. Each juror took a solemn oath to answer questions truthfully during voir dire, and each stated that he or she could be fair and impartial. In addition, before the start of the trial, the trial court instructed the jurors that they would be asked to stand and swear to perform their duty to try the case justly and reach a true verdict. The jurors then stood and the court clerk asked them to solemnly swear to answer the questions truthfully, to which the jurors collectively replied, "I do." The trial court then thoroughly explained to the jurors their duties and responsibilities. Finally, at the end of trial, the court reminded the jurors that they had taken an oath to return a true and just verdict based only on the evidence and the court's instructions on the law. Although these alternative efforts were not a perfect substitute for the oath required by MCR 2.511(H)(1), there was no reason to believe that the jurors did not understand the dignity and solemnity of the proceedings.

Court of Appeals' order vacated, convictions and sentences reinstated, and case remanded to Court of Appeals for consideration of defendant's remaining claims on appeal.

Justice VIVIANO, joined by Justice MCCORMACK, dissenting, stated that the juror's oath plays an essential role in every criminal trial and that the majority's holding rendered meaningless the requirement that those who judge another person's guilt or innocence do so under the solemn obligation and sanction of an oath or affirmation. Justice VIVIANO agreed that the issue was properly reviewed under the plain-error standard and that the error here was plain. After detailing the long history, significance, and meaning of what constitutes a trial by jury, Justice VIVIANO concluded that the Sixth Amendment necessarily requires a sworn jury and that the failure to swear the jury amounted to a literal deprivation of defendant's Sixth Amendment right to a jury trial. Further, he would have held that an unsworn jury constitutes a structural error because the juror's oath is woven into the very fabric of a trial and defies any attempt at quantifying the consequences of its absence as it relates to the jury's verdict. As a result, it is not amenable to the prejudice inquiry under the third *Carines* prong. With respect to the fourth *Carines* prong, Justice VIVIANO observed that although the majority began its analysis with that prong, there is substantial overlap between the characteristics of structural errors (that they necessarily render a trial fundamentally unfair) and the standard under the fourth prong (that the error has a serious effect on the fairness, integrity, and public reputation of the proceedings). The fact that a defendant has proved that a particular error is structural should also be sufficient to make the presumptive case that the fairness, integrity, or public reputation of the proceedings have been seriously affected. Adopting this approach—one that recognizes that a structural error provides a rebuttable presumption that the fairness of the proceedings was seriously affected while allowing the prosecution to identify aspects of the trial showing that the fairness, integrity, and public reputation of the proceedings were not seriously affected despite the structural error— would yield an approach to unpreserved structural errors (such as that in this case) that clarifies and better harmonizes the caselaw in this area. Employing this framework, Justice VIVIANO would have held that the failure to swear the jury had a fundamental and serious effect on the integrity of the proceedings; the instances in the trial record that the majority cited to conclude otherwise (features present in every criminal case) did not mitigate the fundamental unfairness that results when a defendant is tried by an unsworn jury.

©2015 State of Michigan

# OPINION

Chief Justice:          Justices:
Robert P. Young, Jr.    Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein

FILED  July 23, 2015

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

  Plaintiff-Appellant,

v                                                        No. 149259

BRANDON LEWIS CAIN,

  Defendant-Appellee.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

This case presents a fundamental question that appellate courts often confront: whether to afford relief on the basis of a claim of error not raised in the trial court. As a general rule, appellate courts will not grant relief on belated claims of error unless the proponent establishes, among other things, that the unpreserved error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Defendant here, who raised for the first time on appeal a claim that the trial court gave the wrong juror's oath, has failed to meet this burden. Our review of the record reveals that the jurors were

conscious of the gravity of the task before them and the manner in which that task was to be carried out, the two primary purposes served by the juror's oath. Thus, we cannot say that the error here of failing to properly swear the jury seriously affected the fairness, integrity, or public reputation of the judicial proceedings. We therefore vacate the Court of Appeals' order holding to the contrary and reinstate defendant's convictions and sentences.

## I. FACTS AND HISTORY

On February 28, 2012, Ashley Conaway and Abreeya Brown were abducted, tortured, and murdered. A month later, their bodies were found buried in a shallow grave, and defendant Brandon Cain and four others were charged in connection with the victims' deaths.[1] All five men were tried at a single trial with two separate juries, one for Cain and a codefendant and another for the remaining codefendants. After three days of jury voir dire, defendant's jury was selected. At the start of trial, the court instructed the jury, "I will now ask you to stand and swear to perform your duty to try the case justly and to reach a true verdict." The clerk proceeded to swear in the jury, but mistakenly read the oath given to prospective jurors before voir dire:

> *The Clerk*: You do solemnly swear or affirm that you will true answers make to such questions as may be put to you touching upon your

---

[1] Specifically, defendant was charged with two counts of first-degree premeditated murder, MCL 750.316(1)(a), two counts of felony murder, MCL 750.316(1)(b), two counts of torture, MCL 750.85, two counts of unlawful imprisonment, MCL 750.349b, carrying a firearm during the commission of a felony, MCL 750.227b, and being a felon in possession of a firearm, MCL 750.224f.

2

qualifications to serve as jurors in the cause now pending before the Court [sic]?[2]

> [*Jurors*]: (Collectively) I do.

There was no objection to the failure to administer the proper oath, although no one disputes that the oath given was incorrect.[3]

A lengthy trial followed, at the end of which the jury convicted defendant as charged. He was sentenced to mandatory terms of life in prison without parole for the murder convictions and various lesser term-of-years sentences for the remaining convictions. On appeal, defendant raised for the first time a challenge to the trial court's failure to properly swear the jury. Defendant's appellate counsel filed a motion for peremptory reversal of his convictions, which the Court of Appeals granted in an order, stating, "The failure to properly swear the jury is a structural error requiring a new trial. *People v Allan*, 299 Mich App 205; 829 NW2d 319 (2013)." *People v Cain*, unpublished order of the Court of Appeals, entered May 2, 2014 (Docket No. 314342). The Court remanded "for a new trial with a properly sworn jury." *Id*.

The prosecutor then sought an appeal in this Court, and we granted leave to appeal on the following question:

> [W]hether the Court of Appeals erred in determining that the failure to properly swear the jury, even in the absence of a timely objection, is a structural error requiring a new trial. [*People v Cain*, 497 Mich 861 (2014).]

---

[2] Bracketed "sic" in original.

[3] The text of the correct oath, which is provided in MCR 2.511(H)(1), is set forth in Part III(C) of this opinion. See also MCL 768.14.

3

## II. STANDARD OF REVIEW

Whether the failure to properly swear the jury, even in the absence of a timely objection, requires that the defendant be afforded a new trial is a question of law, and such questions are reviewed de novo. *People v Chenault*, 495 Mich 142, 159; 845 NW2d 731 (2014).

## III. ANALYSIS

## A. UNPRESERVED ERRORS

Defendant did not object to the trial court's failure to properly swear the jury. His claim on appeal and the Court of Appeals' decision to afford relief therefore implicate the general and longstanding rule in Michigan that "issues that are not properly raised before a trial court cannot be raised on appeal absent compelling or extraordinary circumstances." *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). The essential justification for this rule is fairness, both to litigants, who are best equipped to respond to alleged errors at the time they occur, and to the public, which must bear the cost of new trials that could have been avoided with a timely objection. See *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999) ("[A] contemporaneous objection provides the trial court 'an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights.' "), quoting *Grant*, 445 Mich at 551. As this Court recently explained in *People v Vaughn*, 491 Mich 642, 653-654; 821 NW2d 288 (2012): "This Court 'has long recognized the importance of preserving issues for appellate review.' As a result, '[t]his Court disfavors consideration

4

of unpreserved claims of error,' even unpreserved claims of constitutional error."
(Citations omitted; alteration in original.)

The United States Supreme Court has also long recognized the importance of preserving issues for appellate review. As it has explained:

> If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; "anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal."
>
> This limitation on appellate-court authority serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute. In the case of an actual or invited procedural error, the district court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome. And of course the contemporaneous-objection rule prevents a litigant from " 'sandbagging' " the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor. [*Puckett v United States*, 556 US 129, 134; 129 S Ct 1423; 173 L Ed 2d 266 (2009) (citations omitted).]

This is why the United States Supreme Court and this Court adopted the plain-error test in *United States v Olano*, 507 US 725, 735-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993), and *Carines*, 460 Mich at 763, respectively, and why *Vaughn*, 491 Mich at 655, held that "[a]lthough the violation of the right to a public trial is among the limited class of constitutional violations that are structural in nature," a defendant is still not entitled to relief unless he or she can satisfy the four requirements set forth in *Carines*.

Appellate courts may grant relief for unpreserved errors if the proponent of the error can satisfy the "plain error" standard, which has four parts (the "*Carines* prongs").

5

The first three *Carines* prongs require establishing that (1) an error occurred, (2) the error was "plain"-- i.e., clear or obvious, and (3) the error affected substantial rights-- i.e., the outcome of the lower court proceedings was affected. *Carines*, 460 Mich at 763. If the first three elements are satisfied, the fourth *Carines* prong calls upon an appellate court to "exercise its discretion in deciding whether to reverse," and (4) relief is warranted only when the court determines that the plain, forfeited error resulted in the conviction of an actually innocent defendant or " ' "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings". . . .' " *Id.* (citation omitted; first alteration in original). While "[m]eeting all four prongs is difficult, 'as it should be,' " *Puckett*, 556 US at 135, the plain-error test affords defendants sufficient protection because, as *Vaughn*, 491 Mich at 655 n 42, explained:

> [A]pplication of a plain-error analysis to unpreserved structural error does not deny that error "close consideration," . . . especially because the plain-error analysis . . . requires reviewing courts to consider carefully whether any forfeited error either resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. [Citations omitted.]

In the present case, the parties generally agree that the trial court's failure to properly swear the jury constitutes a plain error that satisfies the first and second *Carines* prongs.[4] The parties disagree, however, about the third and fourth *Carines* prongs. We

---

[4] Whereas the prosecutor concedes that failure to properly swear the jury constituted plain error in that the juror's oath is plainly mandated under MCR 2.511(H)(1), defendant, as well as the dissent, couch defendant's claim in the Sixth Amendment right to a jury trial. We need not decide at this time whether the error here was limited to a violation of a court rule, as the prosecutor argues, or was a structural constitutional error, as defendant argues, because it is undisputed that since this is an unpreserved error,

6

defendant must satisfy the plain-error standard of *Carines* in either event.  See *Vaughn*, 491 Mich at 666-667 ("[E]ven if defendant can show that the error satisfied the first three *Carines* requirements, we 'must exercise . . . discretion' and only grant defendant a new trial if the error 'resulted in the conviction of an actually innocent defendant' or seriously affected the fairness, integrity, or public reputation of judicial proceedings.  Although denial of the right to a public trial is a structural error, it is still subject to this requirement."), quoting *Carines*, 460 Mich at 763 (citation omitted); see also *Johnson v United States*, 520 US 461, 469; 117 S Ct 1544; 137 L Ed 2d 718 (1997) ("[W]e need not decide [whether the error is structural] because, even assuming that [it is], it does not meet the final requirement of [the plain-error test]."); *United States v Turrietta*, 696 F3d 972, 976 n 9 (CA 10, 2012) ("Whether an error can be properly characterized as 'structural' has nothing to do with plain error review . . . .").  Quoting *Carines*, 460 Mich at 774, defendant himself acknowledged in his brief in this Court that "it is ultimately unnecessary for this Court to parse the meaning of the words structural or non-structural, because for both types of error a Defendant must show that there was plain error . . . and '. . . the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.' "   (Emphasis omitted.)   This approach is consistent with the well-established principle that "we will not reach constitutional issues that are not necessary to resolve a case."  *IBM v Dep't of Treasury*, 496 Mich 642, 662 n 67; 852 NW2d 865 (2014) (opinion by VIVIANO, J.) (quotation marks and citation omitted).

Although we need not reach the issue of whether the error here was a structural constitutional error, we would be remiss in light of the dissent's analysis not to point out the following:

(a) The United States Supreme Court has "found an error to be 'structural' . . . only in a very 'limited class of cases' "-- complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and defective reasonable-doubt  instructions.  *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999) (citations omitted).

(b) "No federal court in the history of American jurisprudence has held the constitutional guarantee of trial by jury to necessarily include trial by sworn jury." *Turrietta*, 696 F3d at 982.

(c) This Court has held that even *actual* juror misconduct, such as lying about one's qualifications to serve as a juror, is not structural constitutional error, *People v Miller*, 482 Mich 540, 556; 759 NW2d 850 (2008), and at least one court has held that there is "no reason to treat a failure to administer the oath to the jury as more fundamental in nature—and thus 'structural'—than the jurors' *actual* performance of their duties in conformance with that oath, or the jurors' eligibility or competence to be

7

need not resolve the parties' dispute over the third *Carines* prong because, even assuming defendant has established that element, we are not persuaded that the trial court's failure to properly swear the jury seriously affected the fairness, integrity, or public reputation of the judicial proceedings in this case and defendant does not even argue that he is actually innocent.

## B. FOURTH *CARINES* PRONG

The fourth *Carines* prong embodies the general rule that an appellate court will not correct errors that a party failed to raise below. Reversal is required only in the most serious cases, those in which the error contributed to the conviction of an actually innocent person or otherwise undermined the fairness and integrity of the process to such a degree that an appellate court cannot countenance that error. See *Olano*, 507 US at 736 ("[T]he discretion conferred by [the fourth prong of the plain-error standard] should be

---

jurors," *State v Vogh*, 179 Or App 585, 596; 41 P3d 585 (2002) (emphasis added).

(d) The dissent's repeatedly expressed characterization of the oath as being literally "indispensable" is incompatible with its own recognition that a defendant deprived of this right is not entitled to relief unless the plain-error test is satisfied.

(e) The dissent's theory that "the structural nature of the error presumptively establishes the fourth prong" is inconsistent with this Court's recent holding in *Vaughn*, 491 Mich at 654, 667, that even with regards to a structural error, "a defendant is not entitled to relief unless he can establish . . . that the error . . . seriously affected the fairness, integrity, or public reputation of judicial proceedings" and that "[w]hile 'any error that is "structural" is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings,' the plain-error analysis requires us to 'consider whether an error "*seriously*" affected those factors.'" Quoting *Barrows v United States*, 15 A3d 673, 679-680 (DC, 2011).

8

employed in those circumstances in which a miscarriage of justice would otherwise result.") (quotation marks and citation omitted).

A recent example of this Court's application of the fourth *Carines* prong can be found in *Vaughn*. In *Vaughn*, this Court addressed an unpreserved claim that the trial court violated the defendant's Sixth Amendment right to a public trial when it closed the courtroom before jury voir dire. Agreeing with the defendant that his claim satisfied the first three prongs of the *Carines* test, we nonetheless concluded that reversal was not appropriate under the fourth *Carines* prong because the underlying purposes of the public-trial guarantee were alternatively maintained. *Vaughn*, 491 Mich at 664-669. These goals, at least in the context of jury voir dire, included "ensuring a fair trial" and "reminding the prosecution and court of their responsibility to the accused and the importance of their functions[.]" *Id.* at 667. With these goals in mind, this Court reviewed the transcript of the proceedings and concluded "that both parties engaged in a vigorous voir dire process, that there were no objections to either party's peremptory challenges of potential jurors, and that each party expressed satisfaction with the ultimate jury chosen." *Id.* at 668. We also observed that the presence of the jury venire, which was derived from and representative of the public, helped to ensure that the proceedings were subject to a substantial degree of continued public review. *Id.* From our intensive review of the record, we could not conclude that the erroneous closure "seriously affected

the fairness, integrity, or public reputation of judicial proceedings," *id*. at 668-669, and therefore declined to grant relief.[5] (Quotation marks and citation omitted.)

As evidenced by *Vaughn*, the fourth *Carines* prong is meant to be applied on a case-specific and fact-intensive basis. See also *Puckett*, 556 US at 142 ("[A] *per se* approach to plain-error review is flawed.") (quotation marks and citation omitted). The operative inquiry is whether the trial court's error of failing to properly swear the jury *in the particular case* "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carines*, 460 Mich at 774. It is to that inquiry that we now turn.

---

[5] That is emphatically not to say that we viewed the Sixth Amendment right to a public trial as "meaningless" in *Vaughn*, just as we are in no way suggesting in the present case, contrary to the dissent's contention, that the right to a properly sworn jury is a "meaningless" right that can be "easily . . . dispensed with." Each is a critical right that serves a critical function within our criminal justice system. However, not *every* violation of *every* such right must result in an automatic reversal of a defendant's conviction. See *People v Beach*, 429 Mich 450, 491; 418 NW2d 861 (1988) ("We require a fair trial, not a perfect trial."); *People v France*, 436 Mich 138, 142, 161; 461 NW2d 621 (1990) (noting that this Court abolished the "strict rule requiring reversal of a conviction in the event of communication with a deliberating jury outside the courtroom and the presence of counsel" because the "rule of automatic reversal does not serve the best interests of justice and, in many instances, it may very well serve to defeat justice"). Contrary to the dissent's contention, we give considerable "meaning" to the oath by requiring that it be given, by recognizing that if it is not given a material error has occurred, and by assessing the need to reverse because of the error by comparing the purposes served by the oath with the alternative means by which those purposes have been furthered. We further give "meaning" to the oath by our recognition that alternative means of furthering the purposes of the oath are *imperfect* alternatives that require careful judicial review and analysis. That is, we give "meaning" to the oath by recognizing that it constitutes the ideal and by comparing any alternative means of conduct with that ideal.

## C. APPLICATION

Consistently with *Vaughn*, we must first discern the purposes and goals of the juror's oath. The language of the juror's oath reads:

> "Each of you do solemnly swear (or affirm) that, in this action now before the court, you will justly decide the questions submitted to you, that, unless you are discharged by the court from further deliberation, you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the court, so help you God." [MCR 2.511(H)(1). See also MCL 768.14.]

The oath imposes on the jurors three duties: (1) to "justly decide the questions submitted," (2) to "render a true verdict," and (3) to do these things "only on the evidence introduced and in accordance with the instructions of the court." Of course, the oath is more than a mere laundry list of juratorial duties. Instead,

> [t]he oath represents a solemn promise on the part of each juror to do his duty according to the dictates of the law to see that justice is done. This duty is not just a final duty to render a verdict in accordance with the law, but the duty to act in accordance with the law at all stages of trial. The oath is administered to insure that the jurors pay attention to the evidence, observe the credibility and demeanor of the witnesses and conduct themselves at all times as befits one holding such an important position. [*People v Pribble*, 72 Mich App 219, 224; 249 NW2d 363 (1976).]

Our review of the record in this case reveals that the error of failing to properly swear the jury did not undermine the proceedings with respect to the broader pursuits and values that the oath seeks to advance.

One of the primary purposes of the oath-- to impart to the members of the jury their duties as jurors-- was alternatively fulfilled in large part by the trial court's instructions prescribing the particulars of the jurors' duties. Immediately before the swearing of the oath, the trial court instructed the jurors, "I will now ask you to stand and

11

swear to perform your duty to try the case justly and to reach a true verdict." Following the oath, the court instructed the jurors that it was their responsibility to decide the facts of the case solely on the basis of the evidence presented and the law as the court gave it to them, that they should not consider any other information regarding the trial that was not presented in the courtroom, that they should not discuss the case among themselves until deliberations begin, and that they should keep an open mind about the case, setting aside any bias and prejudice. The trial court also explained the concepts of the presumption of innocence and reasonable doubt, instructing the jurors to return a verdict of not guilty unless they unanimously decided that the prosecutor had proved each element of the offenses beyond a reasonable doubt. In addition, before giving the final instructions, the trial court told the jurors, "Remember that you have taken an oath to return a true and just verdict based only on the evidence and my instructions on the law." And during the final instructions, the judge reiterated the previously described instructions, including that the jury was to decide the case on the basis of the evidence presented during the trial and the law as the court gave it to them, setting aside all bias and prejudice. These instructions encompassed, in even greater detail, duties equivalent to those prescribed in the oath.

We recognize that the value of the oath as a whole is probably greater than the sum of its individual parts. The juror's oath involves a conscious promise to adopt a particular mindset-- to approach matters fairly and impartially-- and its great virtue is the powerful symbolism and sense of duty it imbues the oath-taker with and casts on the proceedings. That virtue, however, was not lost in these proceedings. Each juror took a solemn oath to answer questions truthfully during voir dire, and each stated that he or she

12

could be fair and impartial. In addition, before the start of the trial, the trial court told the jurors, "I will now ask you to stand and swear to perform your duty to try the case justly and to reach a true verdict." The jurors then stood and the court clerk asked, "You do solemnly swear or affirm that you will true answers make to such questions as may be put to you touching upon your qualifications to serve as jurors in the cause now pending before the Court?" to which the jurors collectively replied, "I do." Then, as discussed earlier, the trial court thoroughly explained to the jurors their duties and responsibilities. Finally, at the end of trial, the court reminded the jurors, "Remember that you have taken an oath to return a true and just verdict based only on the evidence and my instructions on the law." Although this was not a perfect substitute for the oath required by MCR 2.511(H)(1), we have no reason to believe that the jurors in this case as a result of these alternative efforts to inculcate in them a proper sense of their obligations did not understand the dignity and solemnity of the proceedings.[6]

---

[6] Although the oath that was administered in this case at the beginning of the trial was obviously an incorrect oath, it is noteworthy that MCR 2.511(H)(1) states:

> The jury must be sworn by the clerk *substantially* as follows:

> "Each of you do solemnly swear (or affirm) that, in this action now before the court, you will justly decide the questions submitted to you, that, unless you are discharged by the court from further deliberation, you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the court, so help you God." [Emphasis added.]

In addition, MCL 768.14 states:

> The following oath shall be administered to the jurors for the trial of all criminal cases: "You shall well and truly try, and true deliverance make,

13

Our review of the record also shows that the trial court was particularly vigilant in attempting to ensure that the jury remained fair and impartial throughout the proceedings. When one of the codefendants decided to plead guilty, the trial court conducted voir dire

between the people of this state and the prisoner at bar, whom you shall have in charge, according to the evidence and the laws of this state; so help you God."

Although we are in no way suggesting that the oath that was administered here was even "substantially" the oath required by MCR 2.511(H)(1) or the oath required by MCL 768.14, we would nevertheless be remiss not to note that the precise language of the oath set forth in MCR 2.511(H)(1) is not necessarily required. The dissent is correct that "[f]or as long as the institution we know as 'trial by jury' has existed, juries have been sworn." See 5 Kurland & Lerner, The Founders' Constitution (Chicago: University of Chicago Press, 1987), p 256 (" 'When the trial is called on, the jurors are to be sworn . . . .' "), quoting 4 Blackstone, Commentaries on the Laws of England, p *352; 1 Few, In Defense of Trial by Jury (American Jury Trial Foundation, 1993), p 25 ("The preamble to a statute in the 15th year of the reign of Henry VI recites that 'the trial of the life and death, lands and tenements, goods and chattels of every one of his subjects . . . touching matters of fact . . . is to be . . . made by the oaths . . . of 12 men duly summoned in his courts.") (citation omitted); *id*. at 102 ("[T]he first ordinance adopted by the Plymouth Colony in 1623 was one declaring, among other things, that 'all criminal facts' should be tried 'by the verdict of twelve honest men to be empaneled by authority, in the form of a jury upon their oaths.' ") (citation omitted); *id*. at 169 (stating that in 1774, the First Continental Congress adopted a resolution that stated "neither life, liberty nor property can be taken from the possessor, until twelve of his . . . countrymen . . . shall pass their sentence upon oath against him"). However, the dissent overlooks that the precise language of the oath used to swear the jury has never been a "fixed constant," as is evidenced by the fact that our own court rule, MCR 2.511(H)(1), and statute, MCL 768.14, contain differently worded oaths. Relatedly, we believe that the dissent incorrectly characterizes this case as a "failure to swear the jury" case or a case in which the "defendant [was] tried by an unsworn jury." Although the court clerk indisputably read the wrong oath to the jury, the jury was nevertheless sworn. They rose and solemnly swore to be truthful. Although the court rule and statute clearly required the jury to swear to something more than simply being truthful, we nevertheless believe that the dissent errs by giving no weight whatsoever to the imperfect oath-swearing process that did occur here. Although once again we acknowledge the substantial imperfections of the process, there was a very real oath-swearing that occurred, real in terms of both its substance and the dignity and solemnity of the process.

14

of each juror to verify that the jurors would not be influenced by the codefendant's guilty plea, would retain an open mind, and could continue to be fair and impartial. In this regard, the reasoning of the United States Court of Appeals for the Tenth Circuit for declining to grant relief for a similar error is particularly persuasive:

> [A]ny threat to the integrity of the proceedings was mitigated by an otherwise fair and procedurally rigorous trial. The jury was fairly selected and clearly instructed, and the trial was open to the public and administered by an unbiased judge. Turrietta availed himself of his right to counsel and received an unfettered opportunity to put on evidence and make arguments in defense of his innocence.
>
> Moreover, the record supports the government's contention that the jury understood the thrust of what the oath was designed to impart. The jurors were all sworn to tell the truth during voir dire and were on several occasions reminded by the court of their "sworn duty" to try the case truly and in accordance with the law. The admonition was reinforced over the course of the trial by a steady drumbeat of instructions stressing the importance of rendering a verdict in light of the burden of proof and based solely on the evidence presented. Between the instructions, the oath at voir dire, and the repeated references to the oath at trial, the jurors had plenty to remind them of the importance of their task. If . . . a juror was still unwilling to decide the case based on the law and evidence, it is doubtful the oath would have made a difference. [*Turrietta*, 696 F3d at 985.]

The same is true of the instant case. The record indicates that the jurors were conscious of the gravity of the task before them and the manner in which that task was to be carried out; the jurors each stated under oath that they could be fair and impartial, and the trial court thoroughly instructed them on the particulars of their duties. Just as with the constitutional right to a public trial in *Vaughn*, we require the oath for a reason; however, if the larger purposes served by requiring the oath in the first place are achieved by alternative means, the only reason for reversal would be a preference for an error-free trial, a preference only rarely achieved in the judicial annals. We rejected that concept in

15

*Vaughn* by declining to grant relief for the defendant's deprivation of a public trial because the objectives served by that right were otherwise served, albeit imperfectly. In this case, the objectives served by the oath were also achieved by other means, albeit imperfectly. Therefore, we cannot say that the absence of the oath seriously affected the fairness, integrity, or public reputation of the proceedings in this case.[7] Indeed, we believe that "it would be the *reversal* of a conviction such as this which would" " 'seriously affect[] the fairness, integrity and public reputation of judicial proceedings' " because " '[r]eversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' " *Johnson*, 520 US at 470 (citations omitted; emphasis added.).

The error of the Court of Appeals in arriving at the opposite conclusion stems from its failure to conduct a case-specific and fact-intensive inquiry under the fourth *Carines* prong. See *Puckett*, 556 US at 142. It does not suffice under this prong to simply state that an error "require[s] a new trial." In truth, this error stems from the *Allan* decision, which, after concluding that the failure to swear the jury satisfied the first three

---

[7] As observed earlier, the dissent's contention that "the structural nature of the error presumptively establishes the fourth prong, shifting the burden to the prosecution to show that, in fact, the fairness, integrity, and public reputation of the proceeding were not seriously affected," is inconsistent with this Court's recent holding in *Vaughn*, 491 Mich at 654, that *even with regards to a structural error* "a defendant is not entitled to relief unless he can establish . . . that the error . . . seriously affected the fairness, integrity, or public reputation of judicial proceedings." Moreover, even under the dissent's "shifted burden" or "rebuttable presumption" approach, we believe that the prosecutor has shown that the fairness, integrity, and public reputation of the proceedings were not seriously affected and therefore that defendant is not entitled to relief.

16

*Carines* prongs, did not take a case-specific approach to the fourth prong. Rather, *Allan* reasoned:

> [T]he trial court's failure to administer the oath to the jury seriously affected the fairness, integrity, and public reputation of the judicial proceedings. Because the trial court did not administer the oath to the jury, the jury did not undertake the solemn promise to act in accordance with the law at all stages of defendant's trial. The trial court's failure to administer the oath to the jury in this case affected the integrity of the proceedings because it resulted in an invalid verdict under Michigan law. The absence of the oath deprived defendant of a means to ensure that the jury would decide the case honestly in accordance with the law and on the basis of the evidence. Administration of the oath was necessary to protect defendant's fundamental right to a trial by an impartial jury. [*Allan*, 299 Mich App at 218 (citations omitted).]

The problem with *Allan*'s analysis is that it could apply to *every* case in which the jury is improperly sworn. In *Allan*, and in this case as well, courts should have engaged in a fact-intensive and case-specific inquiry under the fourth *Carines* prong to assess whether, in light of any "countervailing factors" on the record, *Puckett*, 556 US at 143, leaving the error unremedied would constitute a miscarriage of justice, i.e., whether the fairness, integrity, or public reputation of the proceedings was seriously affected.

## IV. CONCLUSION

The failure to provide the correct oath was an error, but not one that would result in manifest injustice if left unremedied here. We do nothing to diminish the value of the juror's oath to say that its absence *in this case* did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. It is but one component-- as important and as symbolic as it may be-- in a larger process of fair and impartial adjudication. Because the record before us indicates that defendant was actually ensured a fair and impartial jury, we conclude that his constitutional rights were upheld and

17

reversal is not warranted. We therefore vacate the Court of Appeals' order and reinstate defendant's convictions and sentences. We remand this case to the Court of Appeals for consideration of defendant's remaining claims on appeal. Finally, we caution the trial court in this case, as well as other trial courts in this state, to take particular care that the error that occurred in this case be avoided in the future.

Stephen J. Markman
Robert P. Young, Jr.
Mary Beth Kelly
Brian K. Zahra
Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v                                    No. 149259

BRANDON LEWIS CAIN,

       Defendant-Appellee.

_____

VIVIANO, J. (*dissenting*).

> [H]owever *convenient* [intrusions on the right to trial by jury] may appear at first . . . let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.

> —Sir William Blackstone[1]

The issue in this case is whether the juror's oath, which for centuries has been thought of as the very essence of the jury, may be dispensed with as nothing more than a hollow incantation. There are few, if any, social customs more fundamental to a well-ordered society than the act of swearing an oath. Oaths are invoked in the most solemn occasions in civic life, including when citizens are called to sit in judgment of their peers.

---

[1] 4 Blackstone, Commentaries on the Laws of England, p *350.

Today, the Court holds that the failure to administer the juror's oath does not seriously affect the fairness, integrity, or public reputation of this criminal case. I cannot agree with this conclusion because it renders meaningless the requirement—in existence since the very origin of the jury trial—that those who judge another person's guilt or innocence do so under the solemn obligation and sanction of an oath or affirmation. The juror's oath plays an essential role in every criminal trial, one that cannot so easily be dispensed with by identifying trial features present in every criminal case, as the Court does today. For that reason, I respectfully dissent.

## I. THE PLAIN ERROR STANDARD

Because defendant did not preserve his claim that the trial court failed to swear the jury, this issue is reviewed under the plain error standard.[2] Under this standard, appellate courts may grant relief if the person asserting the error can satisfy four elements (the *Carines* prongs): (1) an error occurred; (2) the error is "plain," that is, clear or obvious; and (3) the plain error affected substantial rights, that is, affected the outcome of the lower court proceedings.[3] If these three elements are satisfied, the fourth element calls on an appellate court to "exercise its discretion in deciding whether to reverse."[4] Relief is only warranted when the court determines that the plain, forfeited error resulted in the

---

[2] *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

[3] *Id.*

[4] *Id.*

2

conviction of an actually innocent defendant or "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings . . . ."[5]

As discussed below, I would hold that the failure to swear the jury amounted to a literal deprivation of defendant's Sixth Amendment right to a jury trial.[6] I would also hold that this error was plain. Finally, I would hold that an unsworn jury constitutes a structural error that is not amenable to the prejudice inquiry under the third *Carines* prong. These three premises establish that the failure to swear the jury has a fundamental and serious effect on the integrity of the proceedings; the features of the trial record that the majority cites to conclude otherwise do not mitigate the fundamental unfairness that results when a defendant is tried by an unsworn jury.

## II. THE SIXTH AMENDMENT GUARANTEES A SWORN JURY

The first question—one that the majority does not address—is whether the trial court committed an error in failing to properly swear the jury. The prosecution concedes that the trial court erred by failing to give the oath required by court rule and statute.[7] However, the basis of defendant's argument is that the trial court's error was

---

[5] *Id.* (quotation marks and citation omitted; first alteration in original).

[6] The majority's reference to the constitutional avoidance doctrine to justify skipping over the first three prongs of the plain error test in this case is misplaced. *Ante* at 7 n 4. As explained below, the fact that an error is constitutional and structural has an undeniable effect on the analysis under the fourth *Carines* prong. This important nuance in the legal analysis is lost by avoiding the first three prongs simply because the ultimate result might be the same. More importantly, when the constitutional analysis would yield a different, more favorable result for the defendant, as I find it does in this case, the constitutional avoidance doctrine has no application.

[7] See MCR 2.511(H)(1); MCL 768.14.

3

constitutional in nature, as evidenced by his citation of the Court of Appeals' decision in *People v Allan*[8] and his contention that the error in this case was structural. In *Allan*,[9] the Court of Appeals relied on an earlier Court of Appeals case, *People v Pribble*, which held that "[t]he oath is designed to protect the fundamental right of trial by an impartial jury."[10] Neither *Pribble* nor *Allan* provided an extended constitutional analysis, but they present an important issue not yet squarely addressed by this Court or the United States Supreme Court: whether the juror's oath is constitutionally required as part of the Sixth Amendment's guarantee to a trial by jury.[11]

The language of the Sixth Amendment reads, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."[12] In interpreting the constitutional phrase "trial by jury," the guiding principle is "to give the text the meaning it was understood to have at the time of its adoption by the people."[13]

---

[8] *People v Allan*, 299 Mich App 205; 829 NW2d 319 (2013).

[9] *Id*. at 211, 213-215.

[10] *People v Pribble*, 72 Mich App 219, 224; 249 NW2d 363 (1976).

[11] In the one United States Supreme Court decision that even remotely dealt with the issue of unsworn jurors, *Baldwin v Kansas*, 129 US 52, 56; 9 S Ct 193; 32 L Ed 640 (1889), the Court found that "no Federal question is presented . . . of which this court can take jurisdiction" because the defendant had failed to properly preserve the claim of error at trial, as required by a federal statute in effect at that time.

[12] US Const, Am VI; see also *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491(1968) (incorporating the Sixth Amendment right to jury trial against the states under the Fourteenth Amendment); see also Const 1963, art 1, § 20.

[13] *Boumediene v Bush*, 553 US 723, 843; 128 S Ct 2229; 171 L Ed 2d 41 (2008) (Scalia, J., dissenting), citing *Crawford v Washington,* 541 US 36, 54; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

The language of the Constitution is the primary indicator of that understanding.[14] When interpreting the Constitution, we presume that "its words and phrases were used in their normal and ordinary as distinguished from technical meaning."[15] Our interpretation of the constitutional text "is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history."[16] This is especially so for the right to trial by jury because it is a basic fact of our constitutional heritage that the ratification of the Sixth Amendment marked the preservation of a long-cherished institution born of English common law.[17]

For as long as the institution we know as "trial by jury" has existed, juries have been sworn. Oaths were already a deeply embedded custom in civic society when the jury trial emerged as the accepted mode of criminal trial.[18] When that happened, "[the

---

[14] See, e.g., *Gibbons v Ogden*, 22 US (9 Wheat) 1, 188; 6 L Ed 23 (1824) ("[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.").

[15] *Dist of Columbia v Heller*, 554 US 570, 576; 128 S Ct 2783; 171 L Ed 2d 637 (2008) (quotation marks and citation omitted).

[16] *Smith v Alabama*, 124 US 465, 478; 8 S Ct 564; 31 L Ed 508 (1888).

[17] *Apprendi v New Jersey*, 530 US 466, 477; 120 S Ct 2348; 147 L Ed 2d 435 (2000) ("[T]he historical foundation for our recognition of [the constitutional protections of the Sixth Amendment] extends down centuries into the common law."); *Gannett Co, Inc v DePasquale*, 443 US 368, 385; 99 S Ct 2898; 61 L Ed 2d 608 (1979) ("The common-law right to a jury trial . . . is explicitly embodied in the Sixth . . . Amendment[].").

[18] Silving, *The Oath: I*, 68 Yale L J 1329, 1330 (1959) ("The familiar oath of the present-day courtroom has been traced to a pre-religious, indeed, pre-animistic period of culture."); see also, generally, White, *Oaths in Judicial Proceedings and Their Effect upon the Competency of Witnesses*, 51 Am L Reg 373 (1903).

5

oath] became an integral part of the jury trial and by the earliest records both jurors and witnesses were sworn."[19]  Indeed, from the inception of the jury trial, "[i]t was the power of the oath which decided the case . . . ."[20]  By the time Sir William Blackstone wrote his Commentaries on the Laws of England in the mid-eighteenth century, the role of the oath had become so firmly ensconced in the concept of the jury that the body known as "the jury" did not exist until its members swore an oath:

> When a sufficient number of persons impaneled, or *talesmen*, appear, they are then separately sworn, well and truly to try the issue between the parties, and a true verdict to give according to the evidence, *and hence they are denominated the jury,* jurata *and jurors*, [namely] juratores.[21]

The essence of the jury is, and always has been, the swearing of the oath.[22]  This basic historical fact finds compelling support in the etymological roots of the word "jury," which can be traced back to the French words "*juré*" and "*jurée*" and the Latin

---

[19] *Oaths in Judicial Proceedings*, 51 Am L Reg at 386.

[20] *The Oath: I*, 68 Yale L J at 1365; see also Thayer, *"Law and Fact" in Jury Trials*, 4 Harv L Rev 147, 156-157 (1890) (describing the emergence of trial by jury and stating that "it was the jury's oath, or rather their verdict, that 'tried' the case").

[21] 3 Blackstone, p *365 (emphasis added; first italics in original).

[22] *The Oath: I*, 68 Yale L J at 1361 ("Even that distinctive English feature—the jury trial—grew out of Germanic oath practices."); 1 Pollock & Maitland, The History of English Law (2d ed) (Cambridge: Oxford University Press, 1968), bk I, ch VI, p 138 ("The essence of the jury . . . seems to be this : a body of neighbors is summoned by some public officer *to give upon oath* a true answer to some question.") (emphasis added); Forsythe, History of Trial by Jury (2d ed) (Jersey City: Frederick D. Linn & Company, 1875), pp 6-7 ("One important feature of the institution is by no means peculiar to it.  I mean the fact that it is a sworn tribunal—that its members decide under the solemn sanction of an oath.").

word "*jurare*," which mean "sworn," "oath," and "to swear," respectively.[23] The English ancestor of our "jury" was called "the *jurata*,"[24] which itself was defined as "[a] jury of twelve men *sworn*."[25] Furthermore, at the time our Constitution was written, "jury" was defined as "a company of men, as twenty-four, or twelve, *sworn* to deliver a truth upon such evidence as shall be delivered them touching the matter in question."[26] Nearly every definition of "jury" since then includes reference to swearing an oath.[27] In other

---

[23] *The Oxford Dictionary of English Etymology* (1974), p 500; *Cassell's Latin Dictionary* (1968), pp 331, 846 (rendering it as "*iurare*"); 1 *Heath's Standard French and English Dictionary: French—English* (London: D.C. Heath & Company, 1963), p 478. And the more distant etymological associates of "jury" include "*jurat*," which means "[a] person under oath," 9 *The Anglo-American Encyclopedia and Dictionary* (New York: J. A. Hill & Company, 1904), p 2417, and "*juratory*," which means "comprising an oath," Samuel Johnson, *A Dictionary of the English Language* (1785).

[24] Thayer, *The Jury and Its Development,* 5 Harv L Rev 249, 259 (1892).

[25] 2 *Bouvier's Law Dictionary* (Rawle's rev, 1897), p 56 (emphasis added).

[26] Samuel Johnson, *A Dictionary of the English Language* (1785) (emphasis added); see also Bailey, *An Universal Etymological English Dictionary* (20th ed, 1763) (defining "jury" as "[in *Common Law*] a Company of twenty-four or twelve Men, *sworn* to inquire of the Matter of Fact, and declare the Truth upon such evidence as shall be given to them, relating to the Matter of Fact") (bracketing in original; emphasis added); Potts, *A Compendious Law Dictionary* (1803), p 406 (defining "jury" as "a certain number of persons *sworn* to enquire of and try some matter of fact, and to declare the truth upon such evidence as shall be laid before them") (emphasis added).

[27] See, e.g., *Random House Webster's College Dictionary* (2001) (defining "jury" as "a group of persons *sworn* to render a verdict or true answer on a question or questions submitted to them, esp. such a group selected by law and *sworn* to examine the evidence in a case and render a verdict to a court") (emphasis added); *The Oxford Dictionary of English Etymology* (1974) ("[A] company of men *sworn* to give a verdict.") (emphasis added); *Black's Law Dictionary* (4th ed) ("A certain number of men, selected according to law, and *sworn* (*jurati*) to inquire of certain matters of fact, and declare the truth upon evidence to be laid before them."); *Funk and Wagnalls Practical Standard Dictionary of the English Language* (Chicago: J. G. Ferguson & Associates, 1945), p 628 ("A body of persons (usually twelve) legally qualified and summoned to serve on a judicial tribunal,

words, the oath was, and has always been, a defining criterion of "jury."[28]  In light of this deep etymological pedigree, it seems quite implausible that the Framers, who lived in a time in which society placed great emphasis on oaths,[29] intended anything other than a sworn jury when they drafted the Sixth Amendment.  The term "jury" in the Sixth Amendment naturally referred to a "sworn" jury; adding the descriptor "sworn" would have seemed redundant.

That the Framers understood the word "jury" to necessarily include a requirement that the decision-making body swear an oath finds support in a contextual reading of the Constitution, particularly the provision granting the Senate the power to try all impeachments.[30]  An early version of Article I, § 3 simply authorized the Senate to try all impeachments.[31]  However, it was later revised to explicitly state that "every member shall be on oath[.]"[32]  Elucidating the oath requirement in his Commentaries on the Constitution, Justice Joseph Story wrote:

---

*there sworn* to try well and truly a cause and give a true verdict according to the evidence.") (emphasis added).

[28] Indeed, oaths are so integral to the concept of a jury that, in common parlance, one who refuses to take a required oath is deemed a "nonjuror."  See *Merriam-Webster's Collegiate Dictionary* (2014).

[29] See Amar, *Sixth Amendment First Principles*, 84 Geo L J 641, 694 (1996) (stating that in the Framers' world, "great weight was placed on oaths").  Indeed, the very first statute enacted by Congress assembled under the Constitution was titled, "An Act to regulate the Time and Manner of administering certain Oaths."  1 Cong Ch 1; 1 Stat 23.

[30] See US Const, art I, § 3, cl 6.

[31] 2 Farrand, *The Records of the Federal Convention of 1787* (1937 rev ed) (New Haven: Yale University Press, 1966), p 497.

[32] See *id*. at 552-553.

8

[T]he Senate, when sitting as a court of impeachment, 'shall be on oath or affirmation'; a provision which, as it appeals to the conscience and integrity of the members by the same sanctions which apply to judges and jurors who sit in other trials, will commend itself to all persons who deem the highest trusts, rights, and duties worthy of the same protection and security, at least, as those of the humblest order. It would, indeed, be a monstrous anomaly, that the highest officers might be convicted of the worst crimes without any sanction being interposed against the exercise of the most vindictive passions, *while the humblest individual has a right to demand an oath of fidelity from those who are his peers and his triors.*[33]

This passage is striking for two reasons. First, Story's early account of the content of the Constitution sheds light on the common understanding of the constitutional right to jury trial at the time, namely that the accused "has a right to demand an oath of fidelity from those who are his peers and his triors."[34] Second, the fact that our Framers took care to ensure that senators swore an oath before serving in a juratorial capacity is strong textual evidence that the concept of jury trial enshrined in the Constitution necessarily presupposed a *sworn* jury. Whereas the absence of any mention of an "oath" in the Sixth Amendment is, of course, explained by the fact that it is inherent in the concept and definition of "jury," the same cannot be said for senators sitting as a court of impeachment; hence, the express inclusion of the oath requirement during the drafting process.

Finally, it bears mentioning that numerous courts have similarly concluded that the oath is part of the constitutional guarantee of trial by jury.[35] In fact, "[w]ith a remarkable

---

[33] 1 Story, Commentaries on the Constitution of the United States (4th ed) (Boston: Little, Brown, & Company, 1873), p 549 (originally published in 1833) (emphasis added).

[34] *Id*.

[35] See, e.g., *State v Barone*, 329 Or 210, 226; 986 P2d 5 (1999) ("The jury oath is

9

degree of consensus, courts across the nation agree that swearing the jury is an integral, essential, fundamental component of a fair trial."[36] The majority relies on *United States v Turrietta*[37] for the proposition that no federal court has expressly recognized the Sixth Amendment right to a sworn jury, but its myopic citation ignores the entirety of the *Turrietta* court's constitutional analysis.[38] I need not reproduce *Turrietta*'s constitutional discussion here, but its summary of the constitutional analysis will suffice to show that it supports my conclusion:

> In short, the oath is bound up with some of the great principles giving rise to the very concept of a jury trial. With its appeal to divine judgment and its enduring impression on the conscience of the juror, the oath has 'moved seamlessly' from medieval modes of decisionmaking into the modern courtroom. Its history, together with certain common sense assumptions about the way it works in practice, reveals a strong relationship to the jury's reliability as a fact finder. Whether the relationship is strong enough to

---

designed to vindicate a defendant's fundamental constitutional rights to a fair trial before an impartial jury."); *State v Godfrey*, 136 Ariz 471, 473; 666 P2d 1080 (Ariz App, 1983) ("[T]he juror's oath is an essential element of the constitutional guarantee to a trial by an 'impartial' jury."); *Steele v State*, 446 NE2d 353, 354 (Ind App, 1983) ("Most importantly the oath serves as a safeguard of a criminal defendant's fundamental constitutional right to trial by an impartial jury."); *Commonwealth v Banmiller,* 393 Pa 496, 497; 143 A2d 56 (1958) (swearing of the jury is "fundamental in nature, and implicit in trial by jury"); *Howard v State*, 80 Tex Crim 588, 592; 192 SW 770 (1917) ("[The defendant tried by an unsworn jury] was deprived of a constitutional as well as a statutory right."); *Slaughter v State*, 100 Ga 323, 330; 28 SE 159 (1897) ("[A] conviction by an unsworn jury is a mere nullity . . . ."); see also 47 Am Jur 2d, Jury, § 192, pp 803-804; 50A CJS, Juries, § 520, p 689.

[36] *State v Arellano*, 1998-NMSC-026, ¶ 41; 125 NM 709, 718; 965 P2d 293 (1998) (McKinnon, J., dissenting) (citing numerous examples).

[37] *United States v Turrietta*, 396 F3d 972, 982 (CA 10, 2012).

[38] See *id*. at 978-981.

10

afford the oath constitutional stature is a question we leave unanswered . . . .[39]

My constitutional analysis—rooted in history, original meaning, and a contextual reading of the constitutional text—is entirely consistent with that of federal and state courts that have historically recognized, implicitly and explicitly, the critical role the oath plays in trial by jury.[40]

"Whatever else it may mean in addition, the defendant's constitutional right [to trial by jury] means, always and everywhere, at least what it explicitly says: the [right to be tried by a 'jury']."[41] And a jury is not a jury until it is sworn. Indeed, to separate the oath from "jury" in the Sixth Amendment would be to disembowel all historical pedigree, etymological heritage, and common law meaning from the word "jury."[42] For these

---

[39] *Id*. at 981 (citation omitted). *Turrietta* was ultimately decided on grounds distinguishable from the present case. The panel held that even if it was a constitutional error, it was not "plain" under the governing authority at the time. *Id*. at 983. Here, however, the error was plain in light of the Court of Appeals' holding in *Pribble*. The *Turrietta* court also declined to grant relief under the fourth plain error prong because defense counsel had admitted that he knew about the error and waited until an unfavorable verdict to bring it to the court's attention. *Id*. at 973-974. That was textbook "sandbagging," which, as *Turrietta* observed, imperils the integrity of the judicial system just the same as the error itself. *Id*. at 985. There is no such evidence in this case.

[40] See cases cited in note 35 of this opinion; *Turrietta*, 696 F3d at 978-981; *United States v Martin*, 740 F2d 1352, 1358-1359 (CA 6, 1984) (questioning whether swearing of prospective jurors en masse was "consistent with the dignity and effectiveness which should attend federal court trials" and stating that "the defendant should be accorded the assurance that the jurors have been sworn to try his case by observing them sworn") (quotation marks and citation omitted).

[41] See *Maryland v Craig*, 497 US 836, 862; 110 S Ct 3157; 111 L Ed 2d 666 (1990) (Scalia, J., dissenting) (discussing the Sixth Amendment right of confrontation).

[42] Of course, not every question of constitutional interpretation will fall squarely within the text of a particular provision. Oftentimes, a court will be called on to apply a constitutional phrase, like "trial by jury," to factual situations approaching the outer

11

bounds of the language's plain meaning. For instance, in *Williams v Florida*, 399 US 78; 90 S Ct 1893; 26 L Ed 2d 446 (1970), the Supreme Court addressed whether the Sixth Amendment guaranteed a 12-person jury. After concluding that the text, as informed by its common law heritage, was insufficient to answer the question, see *id*. at 89 (the 12-person size "appears to have been a historical accident"), the Court examined "the function that the particular feature performs and its relation to the purposes of the jury trial," *id*. at 99-100. However, unlike jury size—whose origins "rest on little more than mystical or superstitious insights" and which fluctuated over time, see *id*. at 87-88—the juror's oath represents a fixed constant in the development of the jury trial to the point that it inheres in the very word "jury." When an error constitutes a literal deprivation of a constitutional right, it is generally unnecessary to "abstract[] from the right to its purposes . . . ." *Craig*, 497 US at 862 (Scalia, J., dissenting). The genetic relationship between the oath and the jury distinguishes it from the size of the jury and *Williams*'s functional approach.

Even if *Williams*'s functional approach governed, I would have no difficulty concluding that the oath serves an indispensable function in service of the greater purposes of the constitutional right to a jury trial. To fulfill their role, jurors must "have the duty" to deliberate. *Apodaca v Oregon*, 406 US 404, 410-411; 92 S Ct 1628; 32 L Ed 2d 184 (1972) (stating that the purpose of the jury trial is fulfilled "as long as [the jury] consists of a group of laymen representative of a cross section of the community *who have the duty* and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant's guilt") (emphasis added). And the oath imposes that duty. Without it, those acting as jurors serve without solemn obligation or sanction, and the essential purpose of the jury trial is left unfulfilled. 2 Story, Commentaries, p 541 (stating that the core function of trial by jury cannot be achieved but "by the firm and impartial verdict of a jury sworn to do right, and guided solely by legal evidence and a sense of duty"). Moreover, the oath's directive to conscientiously deliberate and examine the evidence impartially counters the threats of complacency and overzealousness that are more apt to be found in a single, professional arbiter or prosecutor, the two evils the jury was intended to ward off. See *Williams*, 399 US at 100 (the purpose of the jury is "to prevent oppression by the Government" by providing a defendant "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge") (quotations omitted). Finally, the oath serves as the very benchmark for determining whether a defendant was afforded an impartial jury, as guaranteed by the Sixth Amendment. See *Wainwright v Witt*, 469 US 412, 423; 105 S Ct 844; 83 L Ed 2d 841 (1985) (stating that an impartial jury consists of nothing more than "jurors who will conscientiously apply the law and find the facts"). In sum, under the *Williams* functional approach, the oath serves an indispensable role in the constitutional right to a jury trial.

reasons, I would hold that the Sixth Amendment necessarily guarantees the right to a sworn jury and that the trial court's failure to properly swear the jury deprived defendant of this constitutional protection.

## III.  THE CONSTITUTIONAL VIOLATION WAS "PLAIN"

Having established that the error of failing to swear the jury was of constitutional magnitude, I turn now to assess under the second *Carines* prong: whether the error was "plain, i.e., clear or obvious."[43]  Nearly 40 years ago, in *Pribble*, the Court of Appeals held, "The oath is designed to protect the fundamental right of trial by an impartial jury."[44]  Although it was unaccompanied by any of the relevant constitutional analysis above, *Pribble*'s holding that failure to swear the jury signals a constitutional deprivation was nonetheless binding precedent on the trial court at the time of defendant's trial. Therefore, the constitutional error was "plain, i.e., clear or obvious," and the second *Carines* prong is satisfied in this case.[45]

## IV.  THE THIRD *CARINES* PRONG AND FAILURE TO SWEAR THE JURY AS A STRUCTURAL ERROR

The third prong of the plain error standard requires a defendant to establish that the plain error affected his or her substantial rights, which typically means that it affected the outcome of the lower court proceedings.[46]  However, the United States Supreme

---

[43] *Carines*, 460 Mich at 763.

[44] *Pribble*, 72 Mich App at 224.

[45] See *United States v DeChristopher*, 695 F3d 1082, 1091 (CA 10, 2012) (stating that an error is plain if there is binding circuit precedent on point); *Carines*, 460 Mich at 763.

[46] *Carines*, 460 Mich at 763.

Court has noted that "certain errors, termed 'structural errors,' might 'affec[t] substantial rights' regardless of their actual impact on an appellant's trial."[47] Structural error—originally a concept of the harmless error standard, applicable to *preserved* claims of error—is a particular type of constitutional error that is not amenable to harmless error analysis.[48] The concept of structural error is highly relevant under the third prong of the *Carines* plain error standard because the harmless error standard and third *Carines* prong are both functionally "the same kind of inquiry."[49] Because both inquiries examine the effect of the error on the verdict reached in a particular case, it stands to reason that structural errors are likewise not amenable to analysis under the third *Carines* prong.[50] Defendant argues that failure to swear the jury is a structural error satisfying the third *Carines* prong. I agree.

Structural errors comprise a small subset of constitutional errors that "affec[t] the framework within which the trial proceeds," rather than "simply an error in the trial

---

[47] *United States v Marcus*, 560 US 258, 263; 130 S Ct 2159; 176 L Ed 2d 1012 (2010) (alteration in original); see also *People v Vaughn*, 491 Mich 642, 666; 821 NW2d 288 (2012) ("[O]ur caselaw suggests that a plain structural error satisfies the third *Carines* prong."), citing *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000) ("Structural errors . . . are intrinsically harmful, without regard to their effect on the outcome . . . .").

[48] *Arizona v Fulminante*, 499 US 279, 309-310; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

[49] *United States v Olano*, 507 US 725, 734; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

[50] Compare *People v Grant*, 445 Mich 535, 553; 520 NW2d 123 (1994) ("[T]he proper interpretation of the term 'prejudice' in the context of issue preservation for plain error may be equated with the longstanding state precedent of outcome determination."), with *Neder v United States*, 527 US 1, 7; 119 S Ct 1827; 144 L Ed 2d 35 (1999) ("Errors of this type [structural errors] are so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome.").

14

process itself."[51]   Whether an error is "structural" is a function of "the difficulty of assessing the effect of the error."[52]   Whereas structural errors are framework-affecting errors whose consequences are "necessarily unquantifiable and indeterminate," "trial errors" happen during the presentation of the case and can be "quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt."[53]   Structural errors "infect the entire trial process" and "necessarily render a trial fundamentally unfair."[54]   They "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . .' "[55]

The number of constitutional errors labeled "structural" is quite limited.[56] However, I have little difficulty fitting the failure to properly swear the jury into the constellation of structural errors.   The oath is a foundational component of the "framework within which the trial proceeds."[57]   It solemnizes the proceedings at the

---

[51] *United States v Gonzalez-Lopez*, 548 US 140, 148; 126 S Ct 2557; 165 L Ed 2d 409 (2006) (quotation marks and citation omitted) (alteration in original).

[52] *Id*. at 149 n 4.

[53] *Id*. at 148, 150 (quotation marks and citations omitted) (alteration in original).

[54] *Neder*, 527 US at 8 (quotation marks and citations omitted).

[55] *Id*. at 8-9, quoting *Rose v Clark*, 478 US 570, 577-578; 106 S Ct 3101; 92 L Ed 2d 460 (1986).

[56] *Johnson v United States*, 520 US 461, 468-469; 117 S Ct 1544; 137 L Ed 2d 718 (1997) (stating that "[w]e have found structural errors only in a very limited class of cases" and listing cases).

[57] *Gonzalez-Lopez*, 548 US at 148.

15

outset by calling on jurors to make an outward pronouncement that they "will justly decide" the case and "render a true verdict" under the sacred appeal to one's conscience and integrity that follows from swearing an oath.[58]  Its influence pervades the entire proceedings, governing the jury's evaluation of evidence during trial and deliberations on the question of guilt after the close of proofs.  Further, although its historical pedigree as "a 'natural and universal custom' " is evidence of its undeniable influence on people's conduct,[59] it is difficult, if not impossible, to assess as a general matter what tangible effect the absence of the oath has on verdicts.  The influence of the oath on information-processing and judgment functions at a psychological level.  Thus, any generalized statements regarding its tangible effect on jurors' decision-making process and verdict would be purely speculative.[60]

---

[58] MCR 2.511(H)(1).

[59] Milhizer, *So Help Me Allah: An Historical and Prudential Analysis of Oaths as Applied to the Current Controversy of the Bible and Quran in Oath Practices in America*, 70 Ohio St L J 1, 4 (2009) (citation omitted); see also Farid, *Oath and Affirmation in the Court: Thoughts on the Power of a Sworn Promise*, 40 New Eng L Rev 555, 557 (2006) ("[T]hat the oath implicates the motivations it does, that it is in fact so compelling, is indicative of its distinctive stature in our legal system.  Nothing, it seems, is as effective in helping to ascertain the truth in the courtroom.").

[60] See *Gonzalez-Lopez*, 548 US at 150 ("Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.").  Though this does not appear to have deterred scholars from researching this concept.  See St. Eve, Burns & Zuckerman, *More From the #Jury Box: The Latest on Juries and Social Media*, 12 Duke L & Tech Rev 64, 89-90 (2014) ("It is thus not surprising that many jurors in the informal survey referenced their oaths as the reason they did not communicate about the case on social media.  Staying true to their oath was personal—a source of 'pride' for one, a 'civic duty' for another, and a matter of 'respect' for several others.") (citation omitted).  In any event, in so far as this information could generally be available in evidentiary form from the jurors themselves, the law precludes such

The right to a sworn jury—the jury guaranteed by the Constitution—is a " 'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function."[61]   As the Supreme Court stated in *Sullivan v Louisiana*, "The right to trial by jury reflects . . . 'a profound judgment about the way in which law should be enforced and justice administered.'  The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' "[62]  Because the oath is woven into the very fabric of the trial and defies any attempt at quantifying the consequences of its absence as it relates to the jury's verdict, it is the quintessential structural error.[63]

This Court has stated that our caselaw "suggests" that structural errors satisfy the third *Carines* prong.[64]  In my view, however, logic *dictates* that they should.  If the third *Carines* prong is functionally "the same kind of inquiry" as harmless error analysis,[65] it stands to reason that errors that defy harmless error analysis are likewise not amenable to the prejudice inquiry required under the third *Carines* prong.  In fact, the United States

---

inquiries.  *People v Budzyn*, 456 Mich 77, 91; 566 NW2d 229 (1997) (stating that jurors may not impeach their own verdict by subsequent allegations of misconduct relating to the jury's deliberative process).

[61] *Sullivan v Louisiana*, 508 US 275, 281; 113 S Ct 2078; 124 L Ed 2d 182 (1993), quoting *Rose*, 478 US at 577 (alteration in original).

[62] *Sullivan*, 508 US at 281-282 (citation omitted).

[63] See *Gonzalez-Lopez*, 548 US at 150.

[64] *Vaughn*, 491 Mich at 666 ("Accordingly, our caselaw suggests that a plain structural error satisfies the third *Carines* prong.").

[65] *Olano*, 507 US at 734.

Supreme Court has described structural errors as those that "affect substantial rights"—the very standard under the third *Carines* prong.[66] I would make explicit what is "suggested" in our previous cases and hold that structural errors, like the failure to swear the jury in this case, satisfy the third prong without an additional showing of outcome-determinative prejudice.

## V.  THE FOURTH *CARINES* PRONG AND SERIOUS EFFECT ON THE FAIRNESS, INTEGRITY, OR PUBLIC REPUTATION OF JUDICIAL PROCEEDINGS

I come now to where the majority began its analysis: the fourth *Carines* prong. Once a defendant has established that a "forfeited error is 'plain' and 'affect[s] substantial rights,' " an appellate court has discretionary authority to correct the error, but is under no obligation to do so.[67] Because relief on plain error review is in the discretion of the reviewing court, a defendant bears the burden of persuading the court that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."[68]

This area of the law is not a model of clarity, and little has been said on how exactly a defendant goes about carrying his or her burden under the fourth prong,

---

[66] See *Neder*, 527 US at 7 ("Errors of this type [structural errors] are so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome."); *Marcus*, 560 US at 263.

[67] *Olano*, 507 US at 735 (alteration in original).

[68] *United States v Vonn*, 535 US 55, 63; 122 S Ct 1043; 152 L Ed 2d 90 (2002) (quotation marks and citations omitted) (alteration in original); see also *Vaughn*, 491 Mich at 666. Contrary to the majority, there is nothing "incompatible" with holding that the juror's oath is an indispensable feature of the right to trial by jury and requiring a defendant to show plain error. *Ante* at 8 n 4. The majority's assertion conflates two distinct stages in the appellate decision-making process: determining whether an error occurred and determining whether the error warrants relief.

especially when the error is structural.[69]  Nevertheless, a basic unarticulated framework can be gleaned from the existing caselaw that, if adopted by a majority of the Court, would provide some order to the analysis in this area of the law.

### A.  STRUCTURAL ERRORS AND THE FOURTH *CARINES* PRONG

It is undisputed that "a plain error affecting substantial rights does not, *without more*, satisfy the [fourth *Carines* prong], for otherwise the discretion afforded by [the plain error test] would be illusory."[70]  What this means in a typical case involving a garden-variety trial error is that a defendant will have to show more than simply that there is a reasonable probability that the forfeited error affected the outcome of the trial under the third *Carines* prong.  He or she must also make the case for why the court should overlook the preservation requirement and grant relief.  That requires the defendant to show that the error resulted in a wrongful conviction or seriously affected the fairness, integrity, or public reputation of the proceedings.

In the context of structural errors, however, the analysis under the third *Carines* prong is different.  Structural errors satisfy the third prong because the type of inquiry that the third prong calls for is simply not possible when dealing with structural errors.

---

[69] I am not the first to recognize that this area of the law is in need of some clarity.  See *Marcus*, 560 US at 270-271 (Stevens, J., dissenting) ("This Court's ever more intensive efforts to rationalize plain-error review may have been born of a worthy instinct.  But they have trapped the appellate courts in an analytic maze that, I have increasingly come to believe, is more liable to frustrate than to facilitate sound decision-making."); *United States v Robinson*, 485 US 25, 36; 108 S Ct 864; 99 L Ed 2d 23 (1988) (Blackmun, J., concurring in part and dissenting in part) (observing the "confusion reflected in the Court of Appeals' application of the plain-error standard").

[70] *Olano*, 507 US at 737 (emphasis added).

But structural errors are structural, not just because their effect on the result is indeterminate, but also because they "necessarily render a trial fundamentally unfair"[71] and, by definition, mean that the " 'criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . .' "[72] As a result, there is substantial overlap between the characteristics of structural errors (i.e., they "necessarily render a trial fundamentally unfair") and the standard under the fourth *Carines* prong ("serious effect on the fairness, integrity, or public reputation of the proceedings").[73] As a matter of transitive logic, the fact that the defendant has proved that a particular error is structural should also be sufficient to make the presumptive case that the fairness, integrity, or public reputation of the proceedings has been seriously affected. In short, structural errors carry with them *Olano*'s something "more" that is required to establish the fourth prong.[74]

---

[71] *Neder*, 527 US at 8 (quotation marks and citation omitted).

[72] *Id*. at 8-9, quoting *Rose*, 478 US at 577-578; see also *United States v Dominguez Benitez*, 542 US 74, 81; 124 S Ct 2333; 159 L Ed 2d 157 (2004) (characterizing structural errors as those that "undermin[e] the fairness of a criminal proceeding as a whole").

[73] See Berger, *Moving Toward Law: Refocusing the Federal Courts' Plain Error Doctrine in Criminal Cases*, 67 U Miami L Rev 521, 544 (2013) ("[T]he third and fourth prongs of the Olano inquiry both require the same kind of judgment—an evaluation of whether the error had sufficiently serious consequences to merit reversal—but the fourth prong merely requires a higher level of seriousness."); Graham, *Abuse of Discretion, Reversible Error, Harmless Error, Plain Error, Structural Error; A New Paradigm for Criminal Cases*, 43 Crim L Bull, 955, 971 (2007) ("In short, prong three and prong four are, in spite of the protestations in *Olano* to the contrary, in practice coterminous.").

[74] *Olano*, 507 US at 737 ("[A] plain error affecting substantial rights does not, *without more*, satisfy the [fourth prong], for otherwise the discretion afforded by [the plain error test] would be illusory.") (emphasis added).

This recognition of how structural error analysis relates to the fourth *Carines* prong yields an approach to unpreserved structural errors that clarifies and better harmonizes the caselaw in this area, both in theory and in practice.[75]  In theory, the existence of a structural error—whose effect on the trial is unquantifiable and indeterminate—is incompatible with the requirement that a defendant identify specific facts on the record showing that the error seriously affected the fairness, integrity, or public reputation of the proceedings.  The only way to resolve this apparent incongruity is to recognize that a structural error provides a rebuttable presumption that the fairness of the proceedings was seriously affected, while still allowing the prosecution to identify aspects of the trial record that show that the fairness, integrity, or public reputation of the proceedings were, in fact, not seriously affected despite the structural error.  This framework recognizes the undeniable effect a structural error has on the inquiry under the fourth *Carines* prong while still retaining the fact-specific, discretionary characteristics of that final prong.[76]  It also recognizes the reality that in our adversarial system it is the

---

[75] It is also creates some symmetry with the hierarchy of how we treat preserved errors. In that realm, we require the defendant to prove harmfulness unless it is a constitutional claim, in which case we require the prosecution to establish harmlessness.  See *Carines*, 460 Mich at 774.  And when it is structural constitutional error, we grant automatic reversal.  *Duncan*, 462 Mich at 51.  If my thesis is correct, a similar hierarchy exists for unpreserved errors, requiring the proponent of an error to establish that relief is warranted under the fourth *Carines* prong for all errors except constitutional, structural errors.  In those cases, the structural nature of the error presumptively establishes the fourth prong, shifting the burden to the prosecution to show that, in fact, the fairness, integrity, and public reputation of the proceeding were not seriously affected.

[76] It is also consistent with the observations made by the United States Court of Appeals for the Ninth Circuit that "structural error is particularly likely to satisfy *Olano's* fourth

21

prosecution that must offer parts of the record as mitigating the damage caused by a structural error, as occurred in this case.

In practice, this formulation of the fourth prong analysis is nothing new. Rather, I believe it accurately describes how courts have been applying the plain error standard to structural errors all along. In cases in which a court *affirms* a conviction despite a structural error, the court conducts a fact-intensive, case-specific inquiry to conclude that the error did *not* seriously affect the fairness, integrity, and public reputation. Most notably, this is how the Court decided *People v Vaughn*.[77] In *Vaughn*, the Court acknowledged that the closure of the courtroom constituted structural error, but proceeded to examine the record to identify several aspects of the proceedings that indicated that the fairness, integrity, and public reputation of the proceedings were not, in fact, seriously affected.[78] Likewise, in *Johnson v United States*, the Supreme Court addressed the failure to instruct on an element of a charged offense and the defendant's argument that the error was structural.[79] After assuming that the third prong was

---

prong." *United States v Recio*, 371 F3d 1093, 1103 n 7 (CA 9, 2004); see also *United States v Rodriguez*, 406 F3d 1261, 1266 (CA 11, 2005) (Carnes, J., concurring in denial of rehearing en banc) ("So far as can be discovered, no court has ever actually held that an error is structural but fails to meet the fourth prong of the plain error test.").

[77] *Vaughn*, 491 Mich 642.

[78] *Id*. at 668-669. The majority is wrong to claim that my approach to plain error review of structural errors is inconsistent with *Vaughn*. *Ante* at 8 n 4. After recognizing the presence of a structural error, *Vaughn* proceeded to identify features of the trial proceedings showing that despite the structural error, the fairness, integrity, and public reputation of the proceedings were not seriously affected. *Vaughn*, 491 Mich at 668-669. This is entirely consistent with the framework set forth in this opinion.

[79] *Johnson*, 520 US at 467-468.

satisfied, the Court reviewed the record before concluding that the evidence pertaining to the disputed element was overwhelming and, therefore, that the fairness, integrity, and public reputation of the proceedings were not seriously affected.[80]

These cases are entirely consistent with the approach laid out in this opinion, which presumes that the fairness of the trial proceedings is seriously affected, but allows the prosecution to identify elements in the record that mitigate or rebut the notion—inherent in the very occurrence of a structural error—that the error seriously affected the fairness, integrity, or public reputation of the proceedings.

On the other hand, when courts *reverse* on the basis of an unpreserved structural error, they rarely, if ever, discuss additional facts on the record independently of the structural error analysis to establish that the fairness and integrity of the proceedings were seriously affected. Instead, the courts simply reiterate the same basic points made during the structural error analysis. The Court of Appeals decision at the center of this case, *People v Allan*,[81] is a prime example. In explaining why the structural error of failing to swear the jury satisfied the fourth *Carines* prong, the *Allan* panel reasoned:

> [T]he trial court's failure to administer the oath to the jury seriously affected the fairness, integrity, and public reputation of the judicial proceedings. Because the trial court did not administer the oath to the jury, the jury did not undertake the solemn promise to act in accordance with the law at all stages of defendant's trial. The trial court's failure to administer the oath to the jury in this case affected the integrity of the proceedings because it resulted in an invalid verdict under Michigan law. The absence

---

[80] *Id*. at 470; see also *United States v Cotton*, 535 US 625, 632-633; 122 S Ct 1781; 152 L Ed 2d 860 (2002) (employing same method).

[81] *Allan*, 299 Mich App 205.

of the oath deprived defendant of a means to ensure that the jury would decide the case honestly in accordance with the law and on the basis of the evidence. Administration of the oath was necessary to protect defendant's fundamental right to a trial by an impartial jury.[82]

*Allan* is not alone. For instance, in *United States v Floresca*, the United States Court of Appeals for the Fourth Circuit approached the fourth prong analysis by stating:

To begin with, we note that we must once again leave unfulfilled the desire, born of reflex and not of contemplation, to inject a prejudice component into our analysis. Such a consideration may be appropriate and weigh in a defendant's favor in a case where he is required to demonstrate actual prejudice in order to satisfy the third prong—and succeeds in doing so. However, in a case like Floresca's, where the error amounts to a structural defect that renders irrelevant, *ab initio,* the question of prejudice, logic requires us to instead focus on the nature of the error itself.[83]

The court in *Floresca* ultimately exercised its discretion to reverse the defendant's convictions, and in doing so never identified any additional, specific facts on the record establishing the fourth prong. Instead, reasoning in the abstract about the effect the structural error has on proceedings generally, the panel simply concluded: "We do not hesitate to say that convicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal judicial proceedings in a manner most serious."[84]

---

[82] *Id*. at 218 (citations omitted).

[83] *United States v Floresca*, 38 F3d 706, 713 (CA 4, 1994).

[84] *Id*. at 714. For other examples of the *Allan* approach, see *United States v Ramirez-Castillo*, 748 F3d 205, 217 (CA 4, 2014) ("In the instant case, we will exercise our discretion to notice the plain error because failure to do so would seriously affect the fairness, integrity, or public reputation of the judiciary. The Sixth Amendment's jury trial guarantee, which includes, 'as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty," 'is fundamental. *Sullivan*, 508 U.S. at 277, 113 S.Ct. 2078."); *Recio*, 371 F3d at 1103.

*Allan* and cases like it illustrate one simple fact: structural errors, by their nature, seriously affect the fairness and integrity of the proceedings. It may not be so in every case, which is why courts must examine the record for "countervailing factors" to assess whether anything mitigates the serious unfairness typically brought on by a structural error.[85] But when review of the record turns up nothing, the end result of the analysis is simply a reiteration of the structural error analysis.[86]

To be clear, the foregoing does not mean that structural errors *automatically*, *necessarily*, or *always* satisfy the fourth *Carines* prong.[87] This Court has been clear that

---

[85] See *Puckett v United States*, 556 US 129, 142-143; 129 S Ct 1423; 173 L Ed 2d 266 (2009) ("It is true enough that when the Government reneges on a plea deal, the integrity of the system may be called into question, but there may well be countervailing factors in particular cases.").

[86] See, e.g., *Recio*, 371 F3d at 1103 ("As noted above, a finding by this court that there is sufficient evidence for a rational jury to conclude that the appellants joined the conspiracy post-seizure would deny appellants their right to have a jury decide this question. Having carefully reviewed the record, we also cannot say that the evidence against Jimenez Recio and Lopez-Meza was 'overwhelming.' The fourth *Olano* prong is satisfied and we exercise our discretion to remand for a new trial.") (citations omitted).

[87] Because unpreserved structural errors do not automatically require reversal, nothing in this distillation does violence to the interest of issue preservation. Cf. *Rahn v Hawkins*, 464 F3d 813, 820 (CA 8, 2006) ("[W]e do not wish to create incentives for parties to delay pointing out manifest errors to a district court. Were we to reverse, parties would have an incentive to 'sandbag' a trial court, knowing that they could obtain a new trial if things did not go their way on the merits."). This articulation of the plain error standard does not tolerate, let alone encourage, sandbagging, nor does it eliminate any incentive to object to structural errors. The prosecution is free to direct the court's attention to "harboring error," a fact that will invariably sound the death knell for a defendant's case for reversal. Moreover, courts will still independently assess the record to determine whether or not the structural error, in fact, seriously affected the fairness integrity or public reputation of the proceedings in a given case. Thus, defendants forfeit errors at their peril.

they do not.[88]  But it is another question altogether how a defendant goes about satisfying the initial burden of persuading the court that the fairness and integrity of the proceedings have been seriously affected.  Nothing in law or logic dictates that we must treat the third and fourth *Carines* prongs as separate silos.  In fact, it betrays the plain error analysis to disregard the preliminary conclusion that an error is structural when assessing whether it seriously affected the fairness, integrity, or public reputation of the proceedings.  Because, by definition, structural errors "necessarily render a trial fundamentally unfair,"[89] common sense dictates that by establishing a structural error, a defendant makes a presumptive case for serious unfairness and lack of integrity in the proceedings.

But the case is just that: presumptive.  The prosecution then has the opportunity, as it always has, to identify parts of the record showing that, in fact, the fairness, integrity, and public reputation of the proceedings were not seriously affected.  In some cases, the court will find instances in the record that mitigate the unfairness and unreliability that presumptively flow from a structural error—after all, not all structural errors are created equal, and even the same structural error can be committed in a variety of different ways.  In others, however, the record will turn up nothing of tangible benefit.  But this does not mean that the fairness and integrity of the proceeding were not seriously affected—after all, that characteristic is inherent in in very nature of structural error.  In that case,

---

[88] *Vaughn*, 491 Mich at 666-667 ("Although denial of the right to a public trial is a structural error, it is still subject to this requirement.").

[89] *Neder*, 527 US at 8 (quotation marks and citation omitted).

26

defendant will have satisfied the burden under the fourth *Carines* prong by proving the existence of a structural error.

## B.  APPLICATION OF THE FOURTH *CARINES* PRONG

The foregoing is entirely consistent with the basic mode of analysis in the majority opinion today.  Agreeing with the points made by the prosecution on appeal, the majority identifies several aspects of the trial record that, in its view, show that the underlying purposes of the juror's oath were otherwise satisfied and, therefore, that the absence of the oath did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings in this case.  By approaching the question from the negative to conclude that relief is not warranted, it is perfectly consistent with the approach I have outlined above.

I also agree with the majority that our decision in *Vaughn* is instructive, though I believe it provides weak support for the majority's conclusion in this case.  In *Vaughn*, the Court relied on three countervailing considerations to hold that the fourth *Carines* prong was not satisfied: the closure of the courtroom was temporary, it was not complete in that the veniremembers were present, and both sides expressed satisfaction with the end result of voir dire.[90]  None of these considerations is present in this case.  The error in this case infected the entire trial, from its inception through jury deliberations.  Thus, unlike the structural error in *Vaughn*, focusing on the duration and extent of the error in this case provides no support for the conclusion that it did not seriously affect the fairness, integrity, or public reputation of the proceedings.  Also, unlike in *Vaughn*,

---

[90] *Vaughn*, 491 Mich at 667.

defendant has challenged the end result, i.e., the jury's verdict, on multiple grounds. In short, this case features none of the countervailing factors that the Court in *Vaughn* relied on to hold that the fairness, integrity, and public reputation of the proceedings were not seriously affected.

Moreover, I disagree with the majority that the aspects of the record it identifies are sufficient to show that the fairness, integrity, and public reputation of the proceedings were not seriously affected. The majority holds that one of the primary purposes of the oath—to convey to the jury members their responsibility as jurors—was satisfied by the trial court's preliminary instructions. The majority's reliance on the trial court's instructions is misplaced and actually serves to illustrate just how fundamental the oath is to the fairness and integrity of the proceedings. The instructions are meaningful substitutes only if we presume that jurors follow their instructions. The law does make such a presumption, but only because jurors have taken an oath to do so.[91] When the oath is not given, like in this case, that presumption cannot obtain. The trial court's instructions here prove nothing because their efficacy is based on an oath that was never taken.

The other trial feature that, according to the majority, compensated for the oath's absence was the fact that the potential jurors stated under oath during voir dire that they

_____

[91] *United States v Powell*, 469 US 57, 66; 105 S Ct 471; 83 L Ed 2d 461 (1984) ("Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it."); *United States v Padilla*, 639 F3d 892, 897 (CA 9, 2011) ("The significance of the sworn jury is well established. When a jury is sworn, it is entrusted with the obligation to apply the law, and we in turn presume that juries follow instructions given to them throughout the course of the trial.").

could be fair and impartial. Again, I agree with the majority's general method of assessing the record. But having previously determined that the error in this case was structural, I start from the premise that the absence of the juror's oath rendered the proceedings fundamentally unfair. From this perspective, I disagree that statements given under oath regarding a juror's ability to be fair and impartial provides sufficient support for the conclusion that the fairness, integrity, or public reputation of the proceedings were not seriously affected in this case.

Promising to be fair and impartial is only one component of the juror's oath. The juror's oath also calls on prospective jurors to render a "true verdict" and to decide the case based solely on the evidence introduced at trial and the law as it is given to them by the trial court.[92] Indeed, the trier of fact guaranteed by the Constitution is one "capable and willing to decide the case solely on the evidence before it."[93] Although the trial court and the attorneys discussed these concepts during voir dire, my review of the record shows that only three of the jurors who ultimately deliberated over defendant's guilt were asked and answered questions about whether they could consider only the evidence presented in court and the law as it was given to them by the court. The remaining nine jurors gave no indication of their willingness and ability to decide the case based solely on the evidence and law as it was given to them. Thus, a review of the record for evidence that the jurors were willing and able to assume each obligation of the juror's

[92] MCR 2.511(H)(1).

[93] *McDonough Power Equip, Inc v Greenwood*, 464 US 548, 554; 104 S Ct 845; 78 L Ed 2d 663 (1984) (quotation marks and citation omitted).

29

oath—a consideration I agree is relevant to whether the fairness, integrity, or public reputation of the proceedings was seriously affected—shows that it was lacking in this case.

Admittedly, the inquiry under the fourth *Carines* prong is difficult. But where I differ from the majority is in my assessment of the record as it relates to the negative consequences flowing from the structural error in this case. The right to a sworn jury is a " 'basic protectio[n]' . . . without which a criminal trial cannot reliably serve its function[.]"[94] As it relates to the fourth prong analysis, the oath shapes the fairness, integrity, and public reputation of the proceedings in two significant ways. First, it enhances the fairness of the proceedings by assuring the defendant that his or her fate will be decided by jurors who, on their consciences, will decide the case fairly in accordance with the law and evidence. Likewise, it enhances the integrity and reputation of the proceedings by assuring the public that jurors will follow and apply the law as it is given to them, even if they harbor personal disagreements with the law generally. The oath's complete absence diminishes the fairness, integrity, and public reputation of the proceedings. Unless there are other indicia on the record to show that these assurances were otherwise made, reversal is required under the fourth *Carines* prong because failure to swear the jury, as a structural error, renders the proceedings fundamentally unfair.[95]

Lacking in this case is a sufficient indication on the record that the jury was, from the perspective of the defendant and the public, a reliable vehicle by which to judge

---

[94] *Sullivan*, 508 US at 281, quoting *Rose*, 478 US at 577.

[95] *Neder*, 527 US at 8.

defendant's guilt or innocence. I agree with the majority that the record in a given case could, nonetheless, contain evidence that the jurors, in fact, undertook and followed the obligations that would be imposed by the oath. However, statements by jurors touching on only one aspect of the juror's oath, though given under oath, are insufficient to show that the failure to swear the jury did not seriously affect the fairness, integrity, or public reputation of the proceedings.

Nor is it sufficient to say, "Although the court clerk indisputably read the wrong oath to the jury, the jury was nevertheless sworn."[96] The oath given in this case—the voir dire oath—is an "assertory oath" that called on the jurors to "attest[] to some factual matter" (i.e., their qualifications as jurors).[97] The oath that was omitted—the juror's oath—is, by contrast, a "promissory oath" that obliges the swearer to "observe a specified course of conduct in the future" (i.e., to decide the case fairly and in accordance with the law and evidence).[98] I disagree that the jury members in this case were "sworn" in any meaningful sense pertaining to their duties as jurors because the oath they took did not invoke any of the promises contained in the juror's oath. A jury becomes a jury when its members take the *juror's oath*—not just any old oath.[99] A criminal defendant has the

---

[96] *Ante* at 14 n 6.

[97] See *Black's Law Dictionary* (9th ed), p 1176.

[98] *Id.*

[99] For example, we would not say that the jurors were "sworn" if the they took the bailiff's oath, MCL 768.16, the interpreter's oath, MCL 393.506(1), or the presidential oath of office, US Const, art II, § 1, cl 8.

right to assurance that those selected to decide his or her fate fairly in accordance with the law and evidence will carry out *that task* under the solemn obligation of an oath.

In this case, a majority of defendant's jury did not otherwise expressly assume the solemn obligations imposed by the juror's oath. Without this additional support in the record, I am persuaded that the trial court's failure to administer the juror's oath, which deprived defendant of the jury guaranteed to him by the Constitution, seriously affected the fairness, integrity, and public reputation of the proceedings in this case. I would therefore hold that reversal is warranted under the fourth *Carines* prong.

## VI. CONCLUSION

Nothing in this opinion is intended to, or should, diminish the hard work and dedication of those who served as jurors in this case, and who, by all outward appearances, conducted themselves in an appropriate manner throughout the trial. Rather, the origin of this error lies with the trial judge, who failed to perform one of the more routine tasks required in the conduct of a trial. Nor do I take lightly the social costs to the victims' families and others involved in the trial or the public expense associated with a new trial. However, I cannot ignore the cost to society of diminishing the importance of the juror's oath and the harmful consequences that will follow from the subtle undermining of the right trial by jury reflected in today's majority opinion. "Formal requirements are often scorned when they stand in the way of expediency. This Court, however, has an obligation to take a longer view."[100]

---

[100] *Neder*, 527 US at 40 (Scalia, J., concurring in part and dissenting in part).

Appellate courts may no longer be "impregnable citadels of technicality,"[101] but swearing the jury is no technicality; it goes to the heart of trial by jury and is a key component to a fundamentally fair trial.  For that reason, I respectfully dissent.

David F. Viviano
Bridget M. McCormack

---

[101] Traynor, *The Riddle of Harmless Error* (Columbus: Ohio State University Press, 1970), p 14 (quotation marks and citation omitted).